1  Michael Gerard Fletcher (State Bar No. 070849)
   mfletcher@frandzel.com
2  Gerrick M. Warrington (State Bar No. 294890)
   gwarrington@frandzel.com
3  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   1000 Wilshire Boulevard, Nineteenth Floor
4  Los Angeles, California 90017-2427
   Telephone: (323) 852-1000
5  Facsimile: (323) 651-2577

6  Attorneys for Secured Creditor
   ARCHWAY BROADWAY LOAN SPE, LLC
7

8               **UNITED STATES BANKRUPTCY COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10

| In re | Case No. 2:24-bk-12075-VZ |
|---|---|
| Daniel Halevy | Chapter 11 |
| Debtor and Debtor-in-Possession. | **TRANSFER OF CLAIM OTHER THAN FOR SECURITY** |

14         A CLAIM HAS BEEN FILED IN THIS CASE. Transferee hereby gives evidence and

15  notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the

16  claim referenced in this evidence and notice.

| Name of Transferee: | Name of Transferor: |
|---|---|
| Archway Broadway Loan SPE, LLC, a Delaware limited liability company | Archway Real Estate Income Fund I REIT, LLC, a Delaware limited liability company |
| **Name and Address where notices to transferee should be sent:**<br><br>Archway Broadway Loan SPE, LLC<br>c/o Michael Gerard Fletcher<br>Frandzel Robins Bloom & Csato, L.C.<br>1000 Wilshire Boulevard, Nineteenth Floor<br>Los Angeles, California 90017-2427<br>Phone: (323) 852-1000 | Court Claim #: 7<br>Amount of Claim: $131,812.50<br>Date Claim Filed: 7/15/24 |

1    I declare under penalty of perjury that the information provided in this notice is true and

2  correct to the best of my knowledge and belief.

3    By: _____          Date: October 3, 2024

       Bobby Khorshidi

4
5      A director of Archway Real Estate
       Income Fund I REIT, LLC, a Delaware
6      limited liability company, manager of
       Archway Broadway Loan SPE, LLC, a
7      Delaware limited liability company

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

# EXHIBIT A

**Fill in this information to identify the case:**

Debtor 1 __Daniel Halevy__

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: __Central__ District of __California__

Case number __2:24-bk-12075-VZ__

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

### Part 1:    Identify the Claim

**1. Who is the current creditor?**

Archway Real Estate Income Fund I REIT, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  Archway Real Estate Income Fund I SPE I, LLC

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Frandzel Robins Bloom & Csato, L.C. Attention: Michael Gerard Fletcher<br>Name | Archway Capital Attention: Bobby Khorshidi President & CEO<br>Name |
| 1000   Wilshire Boulevard, 19th Floor<br>Number      Street | 1875 Century Park East, 9th Floor<br>Number      Street |
| Los Angeles            CA          90017<br>City                State            ZIP Code | Los Angeles            CA          90067<br>City                State            ZIP Code |
| Contact phone  (323) 852-1000 | Contact phone  (310) 746-8999 |
| Contact email  mfletcher@frandzel.com | Contact email  bobby@archwayfund.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known) _____          Filed on _____
                                                                                                         MM   / DD   / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**
   ☒ No
   ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**    See attachment
   $ 131,812.50            . **Does this amount include interest or other charges?**
   ☐ No
   ☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**
   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.
   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
   Limit disclosing information that is entitled to privacy, such as health care information.

   Guaranty of Money Loaned

9. **Is all or part of the claim secured?**
   ☐ No
   ☒ Yes. The claim is secured by a lien on property.

   **Nature of property:**
   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
   ☐ Motor vehicle
   ☒ Other. Describe:    See Attachment

   **Basis for perfection:**    See Attachment
   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:**    $ TBD
   **Amount of the claim that is secured:**    $ TBD
   **Amount of the claim that is unsecured:**    $ TBD        (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:**    $ _____

   **Annual Interest Rate** (when case was filed) See Attachment %
   ☒ Fixed
   ☐ Variable

10. **Is this claim based on a lease?**
    ☒ No
    ☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $ _____

11. **Is this claim subject to a right of setoff?**
    ☒ No
    ☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No<br>☐ Yes. *Check one:* | Amount entitled to priority |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☒ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  07/12/2024
                  MM / DD / YYYY

Signature  _____

Print the name of the person who is completing and signing this claim:

| Name | Bobby _____ Khorshidi _____ |
|---|---|
| | First name    Middle name    Last name |
| Title | Manager of AOL GP, LLC, authorized signer for Archway Real Estate Income Fund I REIT, LLC, fka Archway Real Estate Income Fund I SPE I, LLC |
| Company | Archway Capital |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1875 Century Park East, 9th Floor |
| | Number    Street |
| | Los Angeles _____ CA ___ 90067 ___ |
| | City    State    ZIP Code |
| Contact phone | (310) 746-8999 ___ Email ___ bobby@archwayfund.com |

### ATTACHMENT TO PROOF OF CLAIM

### In re Daniel Halevy

### Case No. 2:24-bk-12075-VZ (Bankr. C.D. Cal.)

---

Archway Real Estate Income Fund I REIT, LLC, fka Archway Real Estate Income Fund I SPE I, LLC ("Archway" or the "Claimant" or the "Creditor") hereby asserts the following claims against debtor Daniel Halevy ("Daniel" or the "Debtor"):

### I.    SUMMARY AND NATURE OF CLAIM

#### A.    Principal, Interest, and Other Amounts Under the Loan Documents.

As of March 18, 2024 (the "Petition Date"), the debtor Daniel Halevy owes Archway not less than **$131,812.50** plus interest (both contract and default interest), late fees, attorney's fees, and costs in amounts according to proof accruing after the Petition Date related to a loan made by Archway to SLA Investments, LLC on April 14, 2023.

This claim amount is composed of the following:

        i.    Principal in an amount not less than $125,000.00; plus

       ii.    Accrued Interest in an amount not less than $3,595.49; plus

     iii.    Default Interest in an amount not less than $3,217.01; plus

     iv.    Attorneys' fees, costs, and other charges in amounts according to proof.

Archway's claims are secured. Interest and costs continue to accrue on a daily basis.

The following loan documents, without limitation (collectively, the "Loan Documents" and each a "Loan Document") are attached hereto as Exhibits 1 through 4 and are submitted in support of Archway's secured claims:

**Exhibit 1.:**    Note dated April 14, 2023, executed and delivered by SLA Investments, LLC as borrower to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

**Exhibit 2.:**    Continuing Guaranty dated April 14, 2023, executed and delivered by Alan Gomperts, Daniel Halevy, David Halevy, and Sue Halevy as guarantors to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

**Exhibit 3.:**    Pledge and Security Agreement dated April 14, 2023, executed and delivered by David Halevy, Alan Gomperts, Sharon Gomperts, Daniel Halevy, and Simon Harkham as pledgor to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

**Exhibit 4.:**    Settlement and Loan Modification Agreement dated April 19, 2023, executed and delivered by Broadway Investments LLC, as borrower and Alan Gomperts, Daniel Halevy and David Halevy as guarantors to and in favor of lender, Archway Real Estate Income Fund I SPE I, LLC.

## II.    ADMINISTRATIVE EXPENSE CLAIMS AND OTHER CLAIMS

This Proof of Claim is without prejudice to claims, if any, that the Claimant has or may have for payment of any administrative expense allowable under Sections 361, 503(b), and/or 507(b) of the Bankruptcy Code or otherwise with respect to any prepetition or postpetition transaction, whether or not such amounts are included in this Proof of Claim, and the right to file such claim or any similar claim at an appropriate time is expressly reserved.  Claimant reserves its right to file an additional or amended proof of claim for, among other things, (a) any administrative claim, including for failure of adequate protection, and (b) any postpetition claim for pre-effective date pendency interest, fees, costs, or charges as provided for under the Loan Documents and applicable law, including 11 U.S.C. § 506(b).

## III.    ADDITIONAL PROOFS OF CLAIM

This Proof of Claim is filed without prejudice to the filling by, or on behalf of, the Claimant of additional proofs of claim with respect to any other liability or indebtedness of the Debtor or any affiliate of the Debtor.

## IV.    NO WAIVER

Filing of this Proof of Claim is not and should not be construed to be:  (a) a waiver or release of the Claimant's rights against any other entity or person liable for all or part of any claim described herein; (b) a waiver of the right to seek to have the reference withdrawn, including, without limitation, with respect to (i) the subject matter of these claims, (ii) any objection or other proceedings commenced with respect thereto, or (iii) any other proceedings commenced in this case against or otherwise involving the Claimant; (c) a waiver of any right to the subordination, in favor of the Claimant, of indebtedness or liens held by creditors of the Debtor; or (d) an election of remedy which waives or otherwise affects any other right or remedy of the Claimant.

## V.    RESERVATION OF RIGHTS

Creditor reserves the right to amend this proof of claim to, without limitation, add additional Loan Documents, to change the claim amount and components of the claim amount, to include administrative claims, and/or to reflect different and/or additional forms of security for the

claim. Any additional or supplemental documentation shall be deemed to have been filed as of the date hereof.

Neither the filing of this Proof of Claim, nor any subsequent appearance, pleading, claim, proof of claim, document, suit, motion, or any other writing or conduct shall be deemed or construed as (i) a consent by Creditor to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Creditor; (ii) a waiver or release of Creditor's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein or therein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related thereto, notwithstanding the designation of such matters as "core" proceedings pursuant to 28 U.S.C. § 157(b)(2), and whether such right to jury trial is pursuant to statute or the United States Constitution; (iii) a consent by Creditor to a jury trial in this Court or any court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (iv) a waiver or release of Creditor's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Judge; or (v) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or any other proceeding which may be commenced in this case against or otherwise involving Creditor. This proof of claim is conditional only and is not intended, nor should it be construed, as the Claimant's consent to jurisdiction in the Central District of California. Without in any way limiting the foregoing, the Claimant's rights to assert any claim they may have against the Debtor, or against any other  party or property other than the Debtor and the Debtor's estate, are expressly reserved.

# EXHIBIT 1

# PROMISSORY NOTE

$125,000.00                                                                      As of April 14, 2023

FOR VALUE RECEIVED, **SLA INVESTMENTS, LLC**, a California limited liability company ("*Borrower*"), promises and agrees to pay to the order of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*"), in lawful money of the United States of America, the principal sum of One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) (the "*Loan*"), or so much thereof as may be advanced and outstanding under the Loan Agreement of even date herewith between Borrower and Lender (the "*Loan Agreement*"), with interest on the unpaid principal sum owing thereunder at the rate or rates or in the amounts computed in accordance with the Loan Agreement, together with all other amounts due Lender under the Loan Agreement, all payable in the manner and at the time or times provided in the Loan Agreement. Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Loan Agreement.

If not sooner due and payable in accordance with the Loan Agreement, Borrower shall pay to Lender all amounts due and unpaid under the Loan Agreement dated as of the date hereof, or on any earlier Maturity Date as set forth in the Loan Agreement. Unless otherwise specified in writing by Lender, all payments hereunder shall be paid to Lender at its office located at 1875 Century Park East. Suite #900, Los Angeles, CA 90067, Attention: Joshua Kohan. Lender reserves the right to require any payment on this Note, whether such payment is a regular installment, prepayment or final payment, to be by wired federal funds or other immediately available funds.

Borrower, co-makers, sureties, endorsers and guarantors, and each of them, expressly waive demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith, ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY BORROWER, except as otherwise provided in the Loan Agreement or other Loan Documents; such parties are and shall be jointly, severally, directly and primarily liable for the payment of all sums owing and to be owing hereon, regardless of and without any notice, diligence, act or omission as or with respect to the collection of any amount called for hereunder or in connection with any right, lien, interest or property at any and all times had or existing as security for any amount called for hereunder.

This Promissory Note ("*Note*") evidences a portion of the advances made, interest due and all amounts otherwise owed to Lender under the Loan Agreement. This Note is executed in conjunction with the Loan Agreement and is secured by the liens and security interests created under the Loan Documents (including those arising under the Security Instrument). Reference is made to the Loan Agreement for provisions relating to repayment of the indebtedness evidenced by this Note, including mandatory repayment, acceleration following default, late charges, default rate of interest, limitations on interest, and restrictions on prepayment.

Lender reserves the right, at Lender's sole expense, exercisable in Lender's sole discretion and without notice to Borrower or any other person, to sell participations, to assign its interest or both, in all or any part of this Note or this debt or the debt evidenced hereby.

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents. Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be

construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law.  It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Loan, or on acceleration of the maturity of the Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation.  Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Loan without the payment of the Prepayment Premium (or, if the Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Loan.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Loan.

**WAIVER OF TRIAL BY JURY.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**THIS WRITTEN NOTE ALONG WITH THE LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This Note shall be governed by and construed in accordance with the laws of the State of California without regard to conflicts of laws principles.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

South Los Angeles - Promissory Note

EXECUTED as of the date first written above.

**BORROWER:**

**SLA INVESTMENTS, LLC**,
a California limited liability company

By: _____
Name: Alan Gomperts
Title: Manager

# EXHIBIT 2

## CONTINUING GUARANTY

**ALAN GOMPERTS,** an individual, **DANIEL HALEVY,** an individual, **DAVID HALEVY,** an individual**, and SUE HALEVY,** an individual (collectively "***Guarantor***"), executed this Continuing Guaranty (this "***Guaranty***") on April 14, 2023 (the "***Effective Date***") in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("***Lender***").

BACKGROUND RECITALS

A.      Lender and **SLA INVESTMENTS, LLC**, a California limited liability company ("***Borrower***") have entered into the Loan Agreement (the "***Loan Agreement***"), dated as of the date hereof governing (among other things) the Loan in the amount of $125,000.00 (the "***Loan***").

B.      The Loan is secured in part by that certain deed of trust lien given by the Borrower to the Lender (the "***Security Instrument***"), and more particularly described in the Loan Agreement. The Security Instrument encumbers Borrower's interest in and to the "Property" described in the Security Instrument (the "***Property***").

C.      Lender would not have entered into the Loan Agreement or made the Loan to Borrower without Guarantor making and delivering this Guaranty.

Therefore, Guarantor (1) acknowledges the receipt and sufficiency of good and adequate consideration for making this Guaranty, and (2) agrees as follows:

1.      Definitions.   Capitalized terms not otherwise defined in this Guaranty will have the meanings set forth in the Loan Agreement.   Within this Guaranty, words of any gender include all other genders and words in the singular number include the plural, unless the context otherwise requires.   The following terms have the following meanings:

"***Bankruptcy Event***" means any of the following events:  (i) any Borrower Party files a petition for relief under Applicable Bankruptcy Law; (ii) any party (other than Lender) files an involuntary petition for relief under Applicable Bankruptcy Law against any Borrower Party and such petition is not dismissed within 90 days after being filed; (iii) a court of competent jurisdiction enters an order for relief under any Applicable Bankruptcy Law which is related in any way to a petition filed under (i) or (ii) above; (iv) any Borrower Party, at any time, requests or consents to any composition, rearrangement, extension, reorganization or other relief of any debtor; (v) any Borrower Party (A) is generally not paying its debts as they become due, (B) is insolvent, (C) fraudulently transfers any of its assets to the detriment of any of its creditors, (D) makes an assignment for the benefit of creditors, or (E) admits in writing that it is unable to pay its debts as they become due; or (vi) a receiver, trustee or custodian is appointed for, or takes possession of, all or substantially all of a Borrower Party's assets or any of the Property, either in a proceeding a Borrower Party brings, or any other Person (except for Lender) brings against a Borrower Party, and any such appointment is not discharged or such possession is not terminated within 60 days after commencing, or the Borrower Party consents to or acquiesces in such appointment or possession (unless such consent or acquiescence is in connection with any Lender initiated proceeding).  A Bankruptcy Event may exist even if an Event of Default cannot be declared because of Applicable Bankruptcy Law.

"***Conveyance Event***" means that (1) legal or equitable title to any part of, or any interest in, the Collateral is vested in any Person other than Borrower or Lender, or (2) Borrower creates or permits any lien (except for the lien for Taxes which are not delinquent), security interest or other encumbrance against or covering the Collateral.

"***Enforcement Costs***" means all reasonable attorneys' fees, legal expenses and other costs Lender incurs to collect or enforce the Guaranteed Obligations or the Loan Documents.

"***Guaranteed Obligations***" means all (a) 100% of the Indebtedness and Interest, and/or (b) the operating costs of the Property, and/or (c) Enforcement Costs, and/or (d) Recourse Amounts.

"***Indebtedness***" means all obligations, liabilities and indebtedness of Borrower arising under the Loan Documents (including all Additional Costs).

"***Interest***" means all accrued and unpaid interest on the Principal Amount.

"***Loan Documents***" means the Loan Agreement, the Security Instrument, the Hazardous Materials Indemnity Agreement, and all other instruments evidencing, guarantying, securing, governing or relating to the Loan, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing Loan Documents.

"***Liquid Assets***" means unencumbered (a) cash on hand or on deposit (including certificates of deposit which mature in less than twelve months) in commercial banks operating in the United States, (b) readily marketable securities issued by the United States, and (c) readily marketable commercial paper rated A-1 by Standard & Poor's Corporation (or a similar rating by any similar organization that rates commercial paper).

"***Recourse Amounts***" any loss, damage, cost, expense, liability, claim or other obligation (including attorneys' fees and costs reasonably incurred), causes of action, suits, claims, demands and judgments of any nature or description whatsoever, which may be imposed upon, incurred by or awarded against Lender or any affiliate thereof as a result of, arising out of or in connection with the following:

(a)     misapplication or misappropriation of Rents, security deposits, or other income, issues, profits and revenues derived from the Property at any time an Event of Default by Borrower exists, provided that any prepaid rent paid more than 1 month in advance as of the date of an Event of Default hereunder by Borrower shall be considered to have been collected after the event of Borrower's default;

(b)     fraud or material misrepresentation of Borrower or Guarantor;

(c)     (i) misapplication or misappropriation of any insurance policies by reason of damages, loss or destruction to any portion of the Property or the Improvements thereon to the full extent of such misapplied or misappropriated proceeds, or (ii) the misapplication or misappropriation of proceeds or awards resulting from the condemnation or taking in lieu of condemnation of any portion of the Property, to the full extent of such misapplied or misappropriated proceeds or awards;

(d)     intentional physical waste of the Property or any portion thereof, and all costs, including reasonable attorney's fees, incurred by Lender to repair or remediate such intentional physical waste, to the full extent of the actual loss incurred by Lender as a result thereof;

(e)     any taxes, assessments or insurance premiums, to the extent not covered by amounts paid into escrow by Borrower to Lender, for which Borrower is liable under the Note, the Security Instrument or any other loan document executed in connection therewith, but only to the extent that Revenue from the Property is sufficient to pay such taxes, assessments or insurance premiums;

South Los Angeles– Guaranty

(f)    failure to pay charges for labor or materials or other charges that can create liens on any portion of the Property;

(g)    loss arising under the Hazardous Materials Indemnity Agreement executed by Borrower in favor of Lender, or Borrower's breach of the hazardous substances covenants, warranties or representation provisions contained in the Security Instrument or other loan documents executed in connection with the Note and Security Instrument, which loss is not caused by Lender after Lender takes title to the Property;

(h)    loss by fire or casualty to the extent not compensated by insurance proceeds collected by Lender;

(i)    any loss resulting from any Guarantor (or any Person comprising any Guarantor), Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Guaranty, the Note, the Security Instrument or any other Loan Document, seeking a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserting in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan, but only if and to the extent that a court of competent jurisdiction determines that such claims were frivolous (i.e., without any merit) and in bad faith; and

(j)    all costs and fees, including without limitation, reasonable attorneys' fees incurred by Lender in the enforcement of subparagraphs (a) through (j) above.

Notwithstanding the foregoing, Recourse Events shall mean the full amount of the Indebtedness upon the occurrence of either of the following events (the "***Full Recourse Events***"):

(a)    a Bankruptcy Event;

(b)    Borrower fails to obtain Lender's prior consent to any subordinate financing secured by the Property; or

(c)    a Conveyance Event; or

(d)    Borrower fails to comply with the "single purpose entity/separateness" covenants set forth in Section 4.1(b) of the Loan Agreement beyond the expiration of all applicable notice cure periods. and such failure results in (or is cited as a factor by a court of competent jurisdiction) the substantive consolidation of Borrower with another Person; or

(e)    Borrower fails to comply with the cash management provisions set forth in Section 6.1 and Section 6.2 of the Loan Agreement beyond the expiration of all applicable notice cure periods.

South Los Angeles– Guaranty

"*Transfer Event*" means the conveyance of any Collateral to Lender or another Person through a foreclosure (or deed in lieu), receivership, bankruptcy or other voluntary or involuntary Borrower action.

2.      Inducement.  Guarantor has an economic investment or interest in Borrower, and an interest in the success of the Property, and Guarantor will substantially benefit from Lender's agreement to make the Loan to Borrower.

3.      Guaranty.  In order to induce Lender to make the Loan to Borrower, Guarantor absolutely, unconditionally and irrevocably guarantees and agrees to pay and perform the Guaranteed Obligations. Notwithstanding anything to the contrary in this Guaranty or any of the other Loan Documents, Guarantor will be liable for all of the Indebtedness and the Enforcement Costs if a Conveyance Event, or a Bankruptcy Event, occurs.

4.      Waivers.

(a)      Guarantor, with respect to the Guaranteed Obligations and the Indebtedness, waives:  (i) **PRESENTMENT FOR PAYMENT**; (ii) **DEMAND**; (iii) **NOTICE OF DEMAND, DISHONOR AND NONPAYMENT**; (iv) **NOTICE OF INTENTION TO ACCELERATE**; (v) **NOTICE OF ACCELERATION**; (vi) **NOTICE OF DISPOSITION OF COLLATERAL**; (vii) **THE DEFENSE OF IMPAIRMENT OF COLLATERAL**; (viii) **THE RIGHT TO A COMMERCIALLY REASONABLE SALE OF COLLATERAL**; (ix) **PROTEST AND NOTICE OF PROTEST**; and (x) **AND DILIGENCE IN COLLECTING, AND BRINGING SUIT AGAINST ANY OTHER PARTY**.

(b)      Lender is not obligated to notify Guarantor of (i) Lender's acceptance of this Guaranty, (ii) any credit extended on the faith of this Guaranty, or (iii) Borrower's failure to pay or perform any Indebtedness which constitutes Guaranteed Obligations.  Lender is not obligated to use diligence in preserving any Person's liability for the Indebtedness or the Guaranteed Obligations.  Lender is not obligated to use diligence in bringing suit to enforce collection, or performance, of the Indebtedness or the Guaranteed Obligations.

(c)      Guarantor waives **ALL DEFENSES GIVEN OR REDUCTIONS IN THE GUARANTEED OBLIGATIONS AVAILABLE TO SURETIES OR GUARANTORS AT LAW OR IN EQUITY** other than the actual payment and performance of the Guaranteed Obligations, including **ALL DEFENSES BASED UPON QUESTIONS AS TO (i) THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THE INDEBTEDNESS OR THE GUARANTEED OBLIGATIONS, OR (ii) THE VALUE OF ANY COLLATERAL**. Guarantor is primarily liable under this Guaranty.

(d)      At any time, Lender may, in its sole discretion, without Guarantor's prior consent, and without impairing, modifying, releasing or otherwise affecting Guarantor's liability under this Guaranty:

(i)      alter, compromise, accelerate, renew, extend, or change the time or manner for the payment of, the Indebtedness;

(ii)      increase or reduce the rate of interest on the Indebtedness;

(iii)      take, surrender, exchange, withdraw, subordinate, alter, modify or eliminate security;

(iv)      (1) add, release, discharge, or (2) settle or compromise with, any Borrower Party or other Person liable for the Indebtedness or the Guaranteed Obligations;

(v)      make any change to the Loan Documents or the manner in which Lender does business with Borrower; or

South Los Angeles– Guaranty

(vi)    apply any moneys received from Borrower or any other source, or from any security or collateral, in the manner Lender determines, without being required to marshal securities or assets or to apply any part of the moneys or security to any particular part of the Guaranteed Obligations.

Lender is not required to retain, hold, protect, exercise due care with respect thereto, perfect security interests in or otherwise assure or safeguard any security for the Indebtedness or the Guaranteed Obligations; and Guarantor's obligations under this Guaranty and any other Loan Documents will not be affected by, and Guarantor will not have any recourse from, Lender's failure (x) to do any of the foregoing with respect to any security for the Indebtedness or the Guaranteed Obligations, or (y) to exercise or not exercise any right or remedy of Lender under the Loan Documents, at law or in equity.

5.    <u>Guaranty Absolute</u>.  Guarantor's liability under this Guaranty is absolute, and will not be modified, released or impaired, for any reason, including because:

(a)    any Person (including any Borrower Party) dies, or is or becomes incapacitated, disabled, dissolved or terminated;

(b)    Lender fails to file or enforce a claim against the estate (either in administration, bankruptcy or other proceeding) of any Borrower Party or another Person;

(c)    Lender cannot recover the Indebtedness from any Borrower Party or another Person for any reason, including any statute of limitations or Applicable Bankruptcy Law;

(d)    Any Borrower Party or another Person is entitled to any defense, setoff or counterclaim related to the Loan, the Indebtedness or the Guaranteed Obligations;

(e)    a Conveyance Event or a Transfer Event occurs;

(f)    Borrower Party (other than Guarantor) or another Person liable for the payment or performance of Indebtedness or the Guaranteed Obligations is released or discharged by operation of law or otherwise (other than a discharge resulting from the payment of the Indebtedness);

(g)    this Guaranty or any other Loan Document is modified, extended, amended, released or waived; or

(h)    Lender fails to give Guarantor notice of an Event of Default under any Loan Document.

6.    <u>Subordination</u>.  Until the Indebtedness is repaid in full (and including all interest accruing, after any Bankruptcy Event, on the Indebtedness):

(a)    Guarantor subordinates all rights to repayment of any current or future indebtedness from Borrower to Guarantor to Lender's prior right to receive or require payment in full of the Indebtedness.

(b)    Guarantor shall not accept any payment or satisfaction of any indebtedness of Borrower to Guarantor.

(c)    Guarantor shall not accept any security for any indebtedness of Borrower to Guarantor.

(d)    If Guarantor receives any payment, satisfaction or security for any indebtedness of Borrower to Guarantor, then Guarantor shall immediately deliver the payment, satisfaction or security to Lender.  Lender will apply the payment, satisfaction or security as set forth in the Loan Agreement.  Guarantor will hold any payment, satisfaction or security Guarantor receives in trust for Lender until the payment, satisfaction or security is delivered to Lender.

7.    <u>Waiver of Right of Subrogation</u>.  To the fullest extent permitted by Applicable Law, Guarantor waives all rights at law or in equity to seek subrogation, contribution, indemnification or any

other form of reimbursement or repayment from any Borrower Party or any other guarantor of, or any other party secondarily liable for, the payment or performance of the Indebtedness or the Guaranteed Obligations until the Indebtedness has been paid and performed in full.  When the Indebtedness has been indefeasibly paid and fully performed, Guarantor will be subrogated to the rights of Lender against Borrower and any endorsers, sureties or other guarantors to the extent of the payments that Guarantor makes on the Guaranteed Obligations.

8.    <u>No Usury</u>.  Lender and Guarantor intend that this Guaranty and the other Loan Documents strictly comply with applicable usury law.  Therefore, Lender and Guarantor agree that:  (i) none of the terms of this Guaranty or the other Loan Documents create a contract to pay for the use, forbearance or detention of money, or interest at a rate in excess of the Maximum Rate; and (ii) no Person (including any Borrower Party) will ever be obligated or required to pay interest on the Indebtedness or any other sums due under the Loan Documents at a rate in excess of the Maximum Rate.  Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges on any portion of the Indebtedness.  If at any time the interest received for the Guaranteed Obligations exceeds the Maximum Rate, then Lender will, at its option, either refund to Guarantor the amount of the excess or credit the amount of the excess against the Guaranteed Obligations.  Guarantor agrees that the Loan and the Guaranty are not usurious and agrees that if, at any time, Guarantor believes that the Loan or the Guaranty is usurious, it shall give Lender (a) notice of the condition and (b) 60 days in which to make an appropriate refund or other adjustment, if necessary, to correct the condition.

9.    <u>Representations and Warranties</u>.  On the Effective Date, Guarantor represents to Lender that:

(a)    Guarantor (i) is solvent, (ii) is not bankrupt and (ii) has no outstanding liens, garnishments, bankruptcies or court actions which could cause Guarantor to become insolvent or bankrupt.  No Bankruptcy Event has occurred.

(b)    Each Guarantor financial statement previously delivered to Lender was prepared in accordance with an Approved Accounting Method or GAAP and completely, correctly and fairly presents the financial condition and the results of operations of each Guarantor on the date and for the period covered by the financial statements.  All other reports, statements and other data that any Guarantor furnished to Lender in connection with the Loan are true and correct in all material respects and do not omit any fact or circumstance necessary to ensure that the statements are not misleading.  Since the date of the last financial statements each Guarantor delivered to Lender, no event, act, condition or liability has occurred or exists, which has had, or may reasonably be expected to have, a material adverse effect upon (a) Guarantor's business, condition (financial or otherwise) or operations, or (b) Guarantor's ability to perform or satisfy, or Lender's ability to enforce, any of the Guaranteed Obligations.  For the purposes of <u>Subsection 9(a)</u> and <u>9(b)</u>, "Guarantor" includes any joint ventures, managing member or general partner of Guarantor.

(c)    There are no suits or proceedings (including condemnation) pending, or to Guarantor's knowledge threatened, against or affecting any Guarantor, another Borrower Party or the Collateral, or involving the validity, enforceability or priority of this Guaranty or any of the Loan Documents.

(d)    If Guarantor is not a natural person, then Guarantor:  (i) is duly organized, validly existing, and in good standing, under the laws of the jurisdiction of its formation; (ii) is duly qualified, authorized to do business, and in good standing, in every jurisdiction (other than the jurisdiction of its formation) in which it must be qualified; and (iii) has the power and authority to own its other assets and transact its present or proposed business.

(e)    Guarantor has the requisite power and authority to execute, deliver and carry out the terms and provisions of this Guaranty, and has taken all necessary actions to authorize its execution, delivery and performance of the Guaranteed Obligations.  Guarantor has duly executed and delivered this Guaranty, and each other Loan Document to which it is a party or under which

6

it is obligated.  Each obligation under this Guaranty or any other Loan Document constitutes, Guarantor's legal, valid and binding obligation, enforceable in accordance with the Loan Document's terms, except to the extent enforcement of any Loan Document is subject to the effect of (i) Applicable Bankruptcy Law, or (ii) general principles of equity.

(f)  Guarantor's execution, delivery and performance of this Guaranty and the other Loan Documents, and compliance with the terms and provisions of this Guaranty and the other Loan Documents, will not (i) contravene any Applicable Law, (ii) conflict or be inconsistent with or result in any breach of any term, covenant, condition or provision of, or constitute a default under, the terms of any other instrument to which Guarantor is a party or by which Guarantor is bound or may be subject, or (iii) violate any term of Guarantor's certificate of formation or other documents and agreements governing Guarantor's existence, management or operation.  Guarantor is not required to obtain any Person's consent to execute, deliver or perform this Guaranty or the other Loan Documents.

(g)  Guarantor is intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

10.  <u>Covenants</u>.  Guarantor absolutely and unconditionally covenants that:

(a)  Guarantor shall pay and perform the Guaranteed Obligations even if, for any reason, (i) Borrower does not pay or perform the Indebtedness or any other Borrower obligations under the Loan Documents, or (ii) the Indebtedness or the Guaranteed Obligations are disaffirmed or terminated (except for payment and performance in full).

(b)  Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower is (for any reason) liable for any portion of the Indebtedness or the Guaranteed Obligations.

(c)  Guarantor will at all times remain intimately familiar with Borrower, the Collateral and Borrower's business operations and financial condition.

(d)  Guarantor will remain liable for the Guaranteed Obligations regardless of whether Borrower's organizational structure changes.

(e)  Notwithstanding any prior reduction or termination of this Guaranty, Guarantor will remain liable for, and (after Lender's demand) pay to Lender, the amount of any prior Indebtedness payment that Lender must (for any reason) pay to Borrower or any other Person.

(f)  Guarantor will not (i) benefit from, (ii) be able to direct the application of, or (iii) have any right to participate in, any Collateral.

(g)  Guarantor will remain obligated under this Guaranty for the Guaranteed Obligations even if Guarantor loses (for any reason) any right against (i) any Borrower Party or other Person, or (ii) the Collateral.

(h)  Lender is not required to pursue any remedies against any Person or the Collateral before demanding that Guarantor pay or perform the Guaranteed Obligations.

(i)  Lender may maintain an action on this Guaranty without joining any other Borrower Party or bringing a separate action against a Borrower Party.

(j)  Until all Indebtedness is indefeasibly repaid, Guarantor shall maintain (a) at least $12,500.00 of Liquid Assets (the "***Liquidity Requirement***"), and (b) a tangible net worth of at least $125,000.00 (the "***Net Worth Requirement***").  Guarantor will provide Lender with evidence (which may include a certificate), satisfactory to Lender in its discretion, establishing Guarantor's satisfaction of the Liquidity Requirement and the Net Worth Requirement within 60 days after the end of each calendar quarter.

South Los Angeles– Guaranty

11.    <u>Financial Statements and Reports</u>.  Guarantor shall deliver to Lender all financial statements, reports and certificates, if any, required under the Loan Agreement.

12.    <u>Multiple Guarantors</u>.  If there are more than one Guarantor, then this <u>Section 12</u> is in effect. Unless the context clearly indicates otherwise, all references to "*Guarantor*" mean either or any Guarantor.

(a)    **Joint Liability**.  Lender may sue any Guarantor, jointly or individually, without impairing Lender's rights against each Guarantor under this Guaranty.  Lender may compromise with any Guarantor or any other Person for any sum Lender sees fit.  Lender may release any Guarantor or any other Person from any liability for the Indebtedness or the Guaranteed Obligations without impairing Lender's right to demand and collect the balance of the Indebtedness or the Guaranteed Obligations from any Guarantor or other Person.  No compromise or release will, except as specifically set forth in this Guaranty, impair Guarantors' rights amongst themselves.

(b)    **Disputes**.  Each Guarantor shall indemnify, defend and hold Lender harmless from and against any Claim Lender may suffer arising from any dispute between Guarantors, **INCLUDING THOSE CLAIMS ACTUALLY OR ALLEGEDLY ARISING FROM LENDER'S SOLE, COMPARATIVE OR CONTRIBUTORY NEGLIGENCE, OR STRICT LIABILITY**, unless a court of competent jurisdiction determines in a final non-appealable judgment that the Claim actual resulted from the intentional misconduct or gross negligence of Lender.

13.    <u>Revival and Reinstatement</u>.  This Guaranty remains in full force and effect during any Bankruptcy Event.  Notwithstanding the full payment and performance of the Obligations and the Guaranteed Obligations, this Guaranty will be reinstated in full force and effect immediately upon the occurrence of any Bankruptcy Event.  If any prior payment or performance of the Obligations or Guaranteed Obligations is rescinded or reduced, or Lender must otherwise restore or return any prior payment or performance of the Obligations or Guaranteed Obligations, then the Guaranteed Obligations will be reinstated to the extent of the payment or performance actually rescinded, reduced, restored or returned.

14.    <u>Rights Cumulative</u>.  Lender's rights under this Guaranty, at law and in equity are cumulative.  Until the Indebtedness is paid and performed in full and this Guaranty is terminated, Lender may exercise, as many times and as often as Lender elects (in its discretion) any rights under this Guaranty, at law and in equity.  This Guaranty does not diminish or discharge Lender's rights under any prior or future guaranty by Guarantor in favor of Lender.

15.    <u>Notices</u>.  Any notice or communication required or permitted under this Guaranty must be made in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

To Lender:          Archway Real Estate Income Fund I SPE I, LLC
                            1875 Century Park East. Suite #900
                            Los Angeles, CA 90067
                            Attention: Joshua Kohan
                            Phone: (310) 893-5277
                            Email: <u>joshua@archwayfund.com</u>

with a copy to:     Thompson Coburn LLP
                            10100 Santa Monica Blvd., Suite 500
                            Los Angeles, CA 90067
                            Attention: Joshua Mogin
                            Phone: (310) 282-2520
                            Email: <u>jmogin@thompsoncoburn.com</u>

South Los Angeles– Guaranty

| To Guarantor: | David Halevy/Sue Halevy |
|---|---|
| | 257 S. Linden Drive |
| | Beverly Hills CA 90212 |
| | Phone: (310) 666-2885 |
| | Email: danhalevy@gmail.com |

Alan Gomperts
264 S. Oakhurst Drive
Beverly Hills CA 90212
Phone: (310) 621-5350
Email: alangomperts@hotmail.com

with a copy to          Locke Lord LLP
300 S. Grand Ave., Suite 2600
Los Angeles, CA 90071
Attention: David S. Kupetz
Phone: (213) 687-6774
Email: David.Kupetz@lockelord.com

or to such other address as Lender or Guarantor may designate in writing and deliver in accordance with this Section. Any change of address will be effective on the 5th Business Day after notice is given pursuant to the terms of this Section. Any notice or communication sent in accordance with this Section will be deemed to be given (i) at the time of personal delivery, or (ii) if sent by delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided in this Section. Guarantor consents to Lender recording any telephone communications between Lender and Guarantor.

16.    Applicable Law.  The Laws of the **STATE OF CALIFORNIA** (without giving effect to its principles of conflicts of law) and of the **UNITED STATES** will govern and control this Guaranty.  If any provision of this Guaranty or the application thereof to any person or circumstance, for any reason and to any extent, shall be invalid or unenforceable, neither the remainder of this Guaranty nor the application of such provision to any other persons or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

17.    Consent to Forum.  **GUARANTOR IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA OVER ANY PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS.  BORROWER AGREES THAT, IN ADDITION TO ANY METHOD OF SERVICE UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING RELATING TO THE LOAN DOCUMENTS AND FILED IN ANY STATE OR FEDERAL COURT SITTING IN LOS ANGELES COUNTY, CALIFORNIA MAY BE SENT AND GIVEN AS SET FORTH IN SECTION 15 ABOVE.**

18.    Waiver of Jury Trial.  **GUARANTOR WAIVES ANY RIGHT TO A JURY TRIAL CONCERNING ANY DISPUTE ARISING FROM OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS.  GUARANTOR HAS BEEN ADVISED BY COMPETENT COUNSEL IN CONNECTION WITH THIS WAIVER.**

19.    Counterparts.  The Loan Documents may be executed in any number of counterparts with the same effect as if all signers executed the same instrument.  All counterparts of each Loan Document must be construed together and will constitute one instrument.

South Los Angeles– Guaranty

20.      <u>Modification or Termination</u>.   This Guaranty may only be amended, modified or terminated by a written instrument executed by Lender and Guarantor.  Guarantor agrees that it will be bound by any written amendment or modification of the Loan Documents, with or without notice to Guarantor, and Guarantor's obligations under this Guaranty and the other Loan Documents will not be impaired because of any such amendment or modification.

21.      <u>Successors and Assigns; Unenforceability of Certain Provisions, Headings</u>.  The terms of this Guaranty are binding on Guarantor and its heirs, devisees, representatives, successors and assigns and inure to the benefit of Lender and all of its transferees, credit participants, successors and assignees.  The headings in this Guaranty are for convenience only and will not limit or otherwise affect any of the terms of this Guaranty.  If any part of the Loan Documents is unenforceable or invalid, then that part of the Loan Documents will be removed from the Loan Documents.  All remaining portions of the Loan Documents will remain enforceable and valid.

22.      <u>Damage Waiver</u>.  Guarantor agrees that Lender will not be liable to Guarantor, any other Borrower Party or any other Person for any punitive, exemplary or consequential damages which may actually or allegedly arise from this Guaranty, the Loan, the other Loan Documents or the Collateral, **INCLUDING ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ACTUALLY OR ALLEGEDLY ARISING FROM THE ORDINARY, CONTRIBUTORY, COMPARATIVE OR SOLE NEGLIGENCE, GROSS NEGLIGENCE OR STRICT LIABILITY, OF ANY BORROWER PARTY OR LENDER**.  The foregoing waiver does not limit or otherwise impair the terms of any other waiver or indemnity in the Loan Agreement.

23.      <u>Assignment</u>.  Lender may assign, sell or offer to assign or sell interests in the Loan or any portion of the Loan Documents (including this Guaranty) and disseminate to any purchaser, assignee or prospective purchaser or assignee any information Lender has pertaining to the Loan or this Guaranty, including credit information on Borrower Parties and any of their respective principals.  If Lender makes any assignment or sells any interest in the Loan or this Guaranty, then Guarantor shall make all modifications, at Lender's or its purchaser's or assignee's expense, to this Guaranty as will facilitate Lender's sale or assignment, provided that no modification will materially add to Guarantor's obligations under this Guaranty or the other Loan Documents.

24.      <u>Imaging</u>.  Except for the Note, Lender may image and destroy the executed, original Loan Documents. Except for the Note, Guarantor waives any right it has, or may have in the future, to claim that the imaged copies of the Loan Documents are not originals or the best evidence of the Loan Documents.

25.      <u>Time</u>.  Time is of the essence for this Guaranty and the other Loan Documents.

26.      <u>California Provisions</u>.  In addition to the waivers set forth elsewhere in this Guaranty:

(a)      Guarantor hereby waives marshaling of assets and liabilities, rights of offset, sale in inverse order of alienation, notice of acceptance of this Guaranty and of any liability to which it applies or may apply, acceleration, presentment, demand for payment, protest, notice of non-payment, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and demands, collection suit or the taking of any other action by Lender.

(b)      Guarantor expressly waives any and all benefits, rights and/or defenses which might otherwise be available to Guarantor under the following sections of the California Civil Code:  Section 2809 (the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal), Section 2810 (a surety is not liable if, for any reason other than the mere personal disability of the principal, there is no liability upon the part of the principal at the time of execution of the contract, or the liability of the principal thereafter ceases), Section 2819 (a surety is exonerated if the creditor alters the original obligation of the principal without the consent of the surety), Section 2822 (a surety's right to have the principal

10

designate the portion of any obligation to be satisfied by the surety in the event that the principal provides partial satisfaction of such obligation), Section 2845 (a surety is exonerated to the extent that the creditor fails to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue and which would lighten the surety's burden), Section 2846 (a surety may compel the principal to perform the obligation when due), Section 2847 (if a surety satisfies the principal obligation, or any part thereof, the principal is obligated to reimburse the surety for the amounts paid by the surety), Section 2850 (whenever the property of a surety is hypothecated with property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation), Section 2899 (where one has a lien upon several things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, if he can do so without risk of loss to himself, or of injustice to other persons, must resort to the property in a certain order, on the demand of any party interested) and Section 3433 (where a creditor is entitled to resort to each of several funds for the satisfaction of his claim, and another person has an interest in, or is entitled as a creditor to resort to some, but not all of them, the latter may require the former to seek satisfaction from those funds to which the latter has no such claim, so far as it can be done without impairing the right of the former to complete satisfaction, and without doing injustice to third persons).

(c)      Guarantor expressly agrees not to exercise or take advantage of any rights, benefits and/or defenses which might be available to Guarantor under the following California Civil Code Sections, unless and until the Guaranteed Obligations shall have been indefeasibly paid and satisfied in full:   Section 2839 (performance of the principal obligation, or an offer of such performance, duly made as provided in the Civil Code, exonerates a surety), Section 2848 (a surety, upon satisfaction of the obligation of the principal, is entitled to enforce remedies which the creditor then has against the principal and to pursue his co-sureties or other third parties after the surety has satisfied the underlying debt, or at least more than his share of it), and Section 2849 (a surety is entitled to the benefit of security held by the creditor for the performance of the principal obligation held by the creditor).

(d)      Guarantor waives any defense that Guarantor may have by reason of the failure of Lender to provide Guarantor with any material facts about Borrower, including any information respecting the financial condition of Borrower, Borrower's ability to perform the Loan obligations or the sufficiency of Lender's security.

(e)      Guarantor waives any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other Person, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons.

(f)      Guarantor waives all rights of indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.  Guarantor hereby waives the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of guarantors or sureties thereunder.

(g)      Guarantor waives all rights and defenses that Guarantor may have because the debtor's (Borrower's) debt is secured by real property.  This means, among other things:

(i)      The creditor (Lender) may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by the debtor.

(ii)      If the creditor forecloses on any real property collateral pledged by the debtor:  (A) the amount of the debt may be reduced only by the price for which that

South Los Angeles– Guaranty

collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) the creditor may collect from Guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from the debtor.

(h)      This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the debtor's debt is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d or 726 of the Code of Civil Procedure.  Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal (Borrower) by the operation of Section 580d of the Code of Civil Procedure or otherwise.  Any summary of statutory provisions is for convenience only, and Guarantor has read and is familiar with the entirety of such provisions.

27.      Entire Agreement.    The Loan Documents constitute the entire understanding and agreement between Borrower, Guarantor and Lender with respect to the transactions arising in connection with the Loan and this Guaranty.  The Loan Documents supersede all prior written or oral understandings and agreements between Borrower, Guarantor and Lender with respect to the Loan and this Guaranty.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK SIGNATURE PAGE FOLLOWS]

South Los Angeles– Guaranty

Guarantor has executed this Guaranty to be effective on the Effective Date.

**GUARANTOR:**

_____

**DAVID HALEVY,** by Daniel Halevy as his attorney in fact

_____

**SUE HALEVY,** an individual

_____

**ALAN GOMPERTS,** an individual

_____

**DANIEL HALEVY,** an individual

# EXHIBIT 3

## PLEDGE AND SECURITY AGREEMENT
### (INTERESTS IN BORROWER)

THIS PLEDGE AND SECURITY AGREEMENT (INTERESTS IN BORROWER) (this "**Agreement**") is made as of **April 14, 2023**, by and between **DAVID HALEVY,** an individual, **SUE HALEVY,** an individual, **ALAN GOMPERTS,** an individual, **SHARON GOMPERTS,** an individual, **DANIEL HALEVY,** an individual, and **SIMON HARKHAM,** an individual ("*Pledgor*"), to and for the benefit of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company, at its principal place of business at  (together with its successors and assigns, collectively, "*Lender*").

### RECITALS

A.    **SLA INVESTMENTS, LLC,** a California limited liability company ("*Borrower*"), is the owner of those certain real property known as "The Sandpiper" and located at 12800 Foxdale Drive, Desert Hot Springs, CA 92240 (the "*Property*"), and legally described in Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "*Security Instrument")*. The Property (together with all other improvements related thereto and other property of any kind owned by Borrower, collectively, the "*Improvements*") are collectively referred to herein as the "*Project*."

B.    Pledgor owns 100% of the membership interests in Borrower.

C.    Borrower is governed pursuant to the terms and provisions of that certain operating agreement, bylaws or similar type of governing document and was organized pursuant those certain articles of organization/incorporation, certificate of formation, or similar type of entity creation document filed with the Office of Secretary of State of the State of California (such agreements, certificates and applications, as amended, modified, supplemented or restated, heretofore or hereafter in accordance with the terms of the Loan Documents (as such term is defined in the Note), collectively, the "*Borrower Organizational Documents*").

D.    Subject to the terms and conditions set forth in that certain Promissory Note made by Borrower in favor and payable to the order of Lender (the "*Note*"), Lender has agreed to make a loan to Borrower in the aggregate principal amount of up to $125,000.00 (the "*Loan*").

E.    Lender has required, as a condition to making that Loan and entering into the Loan Documents, that Pledgor enter into this Agreement.

**NOW, THEREFORE**, for in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which being hereby acknowledged, Pledgor agrees as follows to and for the benefit of Lender:

**Section 1.    Definitions.**

Section 1.1    Certain Definitions. Any capitalized term not defined herein but defined in the Note shall have the same meaning herein set forth in the Note.  In addition, the following terms used in this Agreement shall have the following meanings:

"*Affiliate*" shall mean, as to any particular Person, any Person directly or indirectly, through one or more intermediaries, controlling, Controlled by or under common Control with the Person or Persons in question.

"*Agreement*" has the meaning in the introductory paragraph.

"*Applicable Law*" means (i) all existing and future governmental statutes, laws, rules, orders, regulations, ordinances, judgment decrees and injunctions of any governmental authorities (including environmental laws and the ADA) affecting either Lender, Borrower, any Guarantor, the Project, any Pledged Collateral, or any part thereof, or the ownership, use alteration or operation of the Project, or any part thereof (whether now or hereafter enacted and in force), including those relating to zoning, occupancy, building codes, health, fire and safety; (ii) all permits, licenses and authorizations and regulations relating thereto; and (iii) all covenants, conditions and restrictions contained in any agreements, recorded or unrecorded instruments or other documents at any time in force (whether or not involving any governmental authority) affecting the Project or any part thereof which, in the case of this clause (iii), require repairs, modifications or alterations in or to the Project or any part thereof.

"*Borrower*" has the meaning set forth in Recital A.

"*Borrower Direction*" has the meaning set forth in Section 8.1(i).

"*Borrower Organizational Documents*" has the meaning set forth in Recital C.

"*Control*" means the possession, directly or indirectly, of the power to cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, family relationship or otherwise.

"*Debt*" means all monetary obligations incurred by any Loan Party under the Note or any of the other Loan Documents.

"*Event of Default*" has the meaning set forth in Section 7.1.

"*Exercise Date*" means the date upon which Lender shall have delivered the Exercise Notice to Pledgor and Borrower.

"*Exercise Notice*" means, following the occurrence of an Event of Default, a notice from Lender to Borrower and Pledgor that Lender has terminated Pledgor's right to exercise the Voting Rights.

"*Guarantor*" means **David Halevy**, an individual.

"*Guaranty*" means that certain Continuing Guaranty, dated of even date herewith, executed by Guarantor, in connection with the Loan and in favor of Lender.

"*Improvements*" has the meaning set forth in Recital A.

"*Lender*" has the meaning set forth in the introductory paragraph.

"*Loan Party*" means Borrower, Guarantor and Pledgor.

"*No-Action Letters*" shall mean various No-Action Letters issued by the SEC staff as described in Section 8.2(b) below.

"*Obligor*" shall mean and include Borrower, Pledgor, and Guarantor and each other Person being obligated in any manner whatsoever for the payment or performance of, giving security for, or otherwise liable with respect to, the Obligations.

"***Obligations***" means all present and future debts, obligations and liabilities of Borrower to Lender arising pursuant to, or on account of, the provisions of the Note, any of the other Loan Documents, including the obligations: (a) to pay all principal, interest, late charges, prepayment premiums (if any) and other amounts due at any time under the Note; (b) to pay all expenses, indemnification payments, fees and other amounts due at any time under any of the other Loan Documents, together with interest thereon as provided in such Loan Document; and (c) to perform, observe and comply with all of the terms, covenants and conditions, expressed or implied, which Borrower is required to perform, observe or comply with pursuant to the terms of the Note, the Security Instrument (as defined in the Note) and/or any of the other Loan Documents.

"***Person***" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, bank, trust, land trust, estate, association, joint stock company, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

"***Pledged Collateral***" shall mean all of Pledgor's right, title and interest, whether now owned or hereafter acquired, whether direct or indirect, whether legal, beneficial or economic, whether fixed or contingent, whether arising under the Borrower Organizational Documents, under Applicable Law or otherwise (A) as a member in and to Borrower (including Pledgor's 100% of the membership interests in Borrower), Pledgor's interest in any other rights to participate in the equity of Borrower, Pledgor's share of the profits, losses and capital of Borrower, Pledgor's Voting Rights and all of Pledgor's rights in, to and under the Borrower Organizational Documents, including any purchase option, right of first refusal, right of first offer and buy/sell right; (B) any other membership and other interest in and to Borrower or any successors thereto; (C) all of Pledgor's interest in the capital of Borrower and Pledgor's interest in all profits and distributions to which Pledgor shall at any time be entitled in respect of such Pledged Collateral or any other interest in Borrower owned by Pledgor; (D) in all proceeds (including claims against third parties), products, offspring, rents, revenues, issues, profits, royalties, income, benefits, additions and accessions to or of any of the foregoing; (E) other payments, if any, due or to become due to Pledgor in respect of the Pledged Collateral, whether as contractual obligations, damages, insurance proceeds or otherwise; (F) in all books and records (in whatever form or media, including without limitation computerized records, software and disks) relating to any of the foregoing; (G) in all additions to, accessions to, replacements and substitutions of or for any of the foregoing; and (H) in all documents, instruments, certificates, agreements or other evidence of any of the foregoing, whether or not in written form and whether heretofore or hereafter in existence or acquired.

"***Pledgor***" has the meaning set forth in the introductory paragraph.

"***Project***" has the meaning set forth in Recital A.

"***Property***" has the meaning set forth in Recital A.

"***Release Conditions***" has the meaning set forth in Section 9.1.

"***SEC***" shall mean the United States Securities and Exchange Commission.

"***Securities Act***" shall mean the Securities Act of 1933, as it may be amended from time to time.

"***Securities Laws***" shall mean the Securities Act and other applicable federal, state and local securities laws, rules and regulations.

Page 3

"***Successful Bidder***" has the meaning set forth in <u>Section 8.1(iii)</u>.

"***Uniform Commercial Code***" shall mean the Uniform Commercial Code as in effect from time to time in the State of California.

"***Voting Rights***" means (A) all of Pledgor's rights under the Borrower Organizational Documents and other governing documents of Borrower and under Applicable Law to vote and give approvals, consents, decisions and directions and to exercise any other similar right in respect of the Pledged Collateral and/or the business and affairs of Borrower and otherwise to participate in the operation and management of the Borrower; and (B) Pledgor's rights, individually and collectively, as all of the members of Borrower, to manage Borrower's affairs (including, without limitation, the power to sell, mortgage or otherwise deal with Borrower's property, including, without limitation, the Project), to make determinations, to exercise any election (including, but not limited to, election of remedies, the filing of any petition for reorganization or dissolution of Borrower, and the exercise of Borrower's rights as debtor-in-possession in the event Borrower files a petition under Title 11 of the United States Code) or option or to give or receive any notice, consent, amendment, waiver or approval; together with full power and authority to demand, receive, enforce, execute, endorse or cash any checks or other payments, or other instruments or orders, to file any claims and to take any action necessary or advisable in connection with any of the foregoing including the power to remove directors.

**Section 2.    <u>Pledge</u>.**

Section 2.1    <u>Pledged Collateral</u>.  As additional collateral and security for the prompt payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, Pledgor hereby irrevocably grants, delivers, pledges, assigns, hypothecates and transfers to Lender, and hereby grants to Lender a continuing security interest in, and lien on, the Pledged Collateral, including the Voting Rights.

Section 2.2    <u>Pledgor's Exercise of Voting Rights</u>.  Notwithstanding <u>Section 2.1</u>, prior to the Exercise Date, Pledgor may continue to exercise the Voting Rights, subject to the terms and restrictions set forth in the Loan Documents.  From and after the Exercise Date, Lender shall have the exclusive right to exercise all Voting Rights and to vote or consent, or otherwise take action, with respect to the Pledged Collateral.  Pledgor hereby grants to Lender an irrevocable proxy and power of attorney to exercise all Voting Rights and to vote the Pledged Collateral, which proxy and power of attorney shall be effective immediately upon the occurrence of the Exercise Date, and, upon request of Lender, Pledgor agrees to deliver to Lender such further evidence of such irrevocable proxy or power of attorney or such further irrevocable proxy and power of attorney to vote the Pledged Collateral as Lender may reasonably request.  Such proxy and power of attorney is coupled with an interest and thus irrevocable.

Section 2.3    <u>Protect Collateral</u>.  Pledgor shall use its commercially reasonable efforts to warrant and defend, at Pledgor's sole cost and expense, the right and title in and to the Pledged Collateral granted herein to Lender (and all right, title and interest represented by the Pledged Collateral) against the claims and demands of all Persons whomsoever.

Section 2.4    <u>Closing Date Requirements</u>.  Pledgor covenants, represents and warrants to Lender that on or prior to the Closing Date Pledgor has requested that Borrower execute and deliver the Consent of Borrower, the form of which is attached hereto as <u>Exhibit A</u>.

Section 2.5    <u>Distributions</u>.   During the continuance of an Event of Default, Pledgor shall not cause or consent to any distribution by Borrower.

Section 2.6    <u>Further Assurances</u>.  In addition to all other covenants and agreements of Pledgor hereunder, Pledgor, at its sole cost and expense, further agrees to:  (a) do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all and every such further acts, deeds, conveyances, assignments, Uniform Commercial Code financing statements, continuation statements, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, carrying out, conveying, assigning, transferring, pledging, hypothecating, perfecting, preserving and confirming unto Lender the lien, security interests and other rights granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted or transferred, or intended now or hereafter so to be, under this Agreement, or for carrying out the intention or facilitating the performance of the terms of this Agreement; and (b) at the request of Lender, execute and deliver one or more Uniform Commercial Code financing statements (including continuation statements related thereto, assignments thereof and amendments thereto) or other instruments to evidence more effectively the security interest of Lender in the Pledged Collateral or any portion thereof.  In addition, Pledgor hereby authorizes Lender to execute any such Uniform Commercial Code financing statements, continuation statements, assignments, amendments or other instruments without the signature of Pledgor (where permitted by Applicable Law) or to execute such Uniform Commercial Code financing statements, continuation statements, in the name of Pledgor or to file or re-file copies of any financing statements, continuation statements and Pledgor hereby grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of taking such action as Lender deems reasonably necessary or advisable to perfect or otherwise protect Lender's security in the Pledged Collateral following the occurrence of an Event of Default, the exercise of any rights or remedies in connection therewith.

Section 2.7    <u>Consideration</u>.  Pledgor acknowledges that Lender would not have entered into the transactions contemplated by the Note and the other Loan Documents without the execution and delivery of this Agreement by Pledgor and such execution and delivery of this Agreement are material inducements to Lender to make the Loan and enter into the Loan Documents.  Pledgor further acknowledges that Pledgor is the owner of a significant ownership interest directly in Borrower, and will receive a direct and material benefit from Lender entering into the Loan Documents and making the Loan to Borrower.  In that regard, Pledgor hereby acknowledges and agrees that the consideration received by such Pledgor for the execution and delivery of this Agreement is actual and adequate.

## Section 3.    <u>Representations and Warranties</u>.

Section 3.1    <u>Pledgor's Representations and Warranties</u>.  Pledgor hereby represents and warrants to Lender as follows:

(a)    <u>Review of Agreement and Loan Documents</u>.  Pledgor has reviewed, with the advice and benefit of its legal counsel, the terms and provisions of this Agreement and each of the other Loan Documents.

(b)    <u>Financial Benefit to Pledgor</u>.  Pledgor is deriving a material financial benefit from the making of the Loan to Borrower.

(c)    <u>Recitals</u>.  All of the Recitals in this Agreement are true, accurate and complete in all material respects.

(d)    <u>Title to Pledged Collateral</u>.  Pledgor is the record and beneficial owner of, and has valid and transferable title to, the Pledged Collateral, and the Pledged Collateral is free and clear of any Lien or claim of any kind other than as created by this Agreement or any other Loan Document.  There are no outstanding options, warrants or other agreements with respect to the Pledged Collateral, and the Pledged Collateral is not subject to, nor will Pledgor at any time permit it to become subject to, any restrictions

governing its issuance, transfer, ownership or control.

(e)    <u>Due Organization</u>.  Pledgor has the power and authority and the legal right to execute, deliver and perform this Agreement and to grant the lien on and security interest in the Pledged Collateral contemplated hereby in favor of Lender.

(g)    <u>Due Authorization; No Violations</u>.  The execution, delivery and performance of this Agreement by Pledgor, the granting of the lien on and security interest in the Pledged Collateral contemplated hereby has been duly authorized by all necessary action and does not and will not (i) violate any applicable law, rule or regulation or any provision of the organizational documents of Borrower or Pledgor, (ii) conflict with, result in a breach of, or constitute a default under any provision of any partnership agreement, operating agreement, indenture, mortgage or other agreement or instrument to which Borrower or Pledgor or any of their Affiliates is a party or by which any of them or their respective properties or assets is bound or subject to, or any license, judgment, order or decree of any governmental authority having jurisdiction over Borrower or Pledgor or any of their Affiliates or their respective activities, properties or assets, or (iii) result in or require the creation or imposition of any lien upon or with respect to any properties or assets now or hereafter owned by Borrower or Pledgor or any of their respective Affiliates (other than the lien and security interest created hereunder).

(h)    <u>Valid Execution</u>.  This Agreement has been duly executed and delivered by Pledgor and constitutes a legal, valid and binding obligation of Pledgor enforceable against Pledgor in accordance with its terms except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(i)    <u>No Consent</u>.  No consent or authorization of, filing with, or other act by or in respect of any arbitrator or Governmental Authority and no consent of any other Person is required (i) for the execution, delivery and performance of this Agreement by Pledgor, (ii) for the realization upon the security interest created to secure Lender in, and lien and pledge by Pledgor of, the Pledged Collateral pursuant to this Agreement, or (iii) for the exercise by Lender of the rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement, except such as (A) have been obtained, made or taken and are in full force and effect, or (B) may be required under federal or state securities laws in connection with any sale of the Pledged Collateral.

(j)    <u>No Pending Actions</u>.  There are no actions, suits, proceedings or investigations pending, to the best knowledge of Pledgor, threatened in writing, against or affecting Pledgor before or by any court, arbitrator or Governmental Authority that have not been disclosed to Lender.

(k)    <u>No Insolvency</u>.  Pledgor is not insolvent (as such term is defined or determined for purposes of any Bankruptcy Law or any other Applicable Law) and the execution and delivery of this Agreement will not make Pledgor insolvent.

(l)    <u>Security Markets</u>.  None of the Pledged Collateral is dealt with or traded on any securities exchanges or in any securities markets.

(m)    <u>Creation, Perfection and Priority of Security Interest</u>.  By reason of the acts taken by Pledgor and Lender pursuant to <u>Section 2.4</u>, Lender has a first priority, perfected security interest in the Pledged Collateral, and no further or additional acts are required to create and perfect Lender's security interest in and lien on the Pledged Collateral and the security interest in and the lien on the Pledged Collateral securing Lender is superior in right and priority to any rights or claims of any other Person.

(n)　　No Other Financing Statements.  Other than the financing statement(s) delivered to Lender by Pledgor, there is no financing statement (or similar statement or registration under the law of any jurisdiction) now on file or registered in any public office covering any interest of Pledgor or any other Person in the Pledged Collateral or intended so to be.

(o)　　Voting Rights.  Except for this Agreement and the other Loan Documents, Pledgor has not entered into, nor is it bound by the terms of, any agreement or understanding restricting or in any way limiting or otherwise relating to the Voting Rights.

(p)　　No Unpaid Expenses.  There are no unpaid expenses, capital contributions, costs, fees, charges or other payments of any kind required to be funded or contributed by Pledgor with respect to the Pledged Collateral that accrued prior to the date hereof.  Pledgor is not otherwise in default beyond applicable notice and cure periods of any of its contractual obligations arising out of the Pledged Collateral. No Person has any right to terminate, or any right to purchase or acquire, any or all of the Pledged Collateral, other than Lender.

(q)　　No Defenses.   There are (i) no setoffs, counterclaims or defenses limiting, restricting or otherwise relating to Pledgor's interest in the Pledged Collateral or (ii) (other than the Borrower Organizational Documents and the Loan Documents) no agreements, resolutions or other circumstances (A) limiting, restricting or otherwise relating to the right of Pledgor to receive any Pledged Collateral or (B) under which any deduction or discount may be claimed with respect to the Pledged Collateral.

(r)　　Truth of Financial Statements.  All financial statements delivered to Lender at any time by or on behalf of Pledgor (i) are true and correct in all material respects and are copies of the financial statements Pledgor prepares and uses in the conduct of its business and have the level of accuracy required therefor, (ii) fairly present in a manner consistent with prior statements submitted to Lender the respective financial conditions of the subjects thereof and for the periods referenced therein, and (iii) have been prepared in accordance with GAAP consistently applied or other accounting method reasonably approved by Lender, and there has been no material adverse change in the financial position of Pledgor since the respective dates of (or periods covered by) the most recent of such statements.  Without limiting the foregoing, all assets shown on such financial statements, unless clearly designated to the contrary on such financial statements, (A) accurately reflect all debt and prior pledges or encumbrances of or on any of Pledgor's assets (direct or indirect) at the date of the financial statements and at all times thereafter and (B) are owned individually by Pledgor and not jointly with any other Person.

(s)　　Conditions Preventing Compliance.  No conditions exist which would prevent Pledgor from complying with the provisions of this Agreement or any of the other Loan Documents to which it is a party within the time limits set forth herein and therein.

(t)　　Taxes.  Pledgor has filed all tax returns and reports required by law to have been filed by it, and has paid all taxes, assessments and governmental charges levied upon it or any of its assets which are due and payable, except any such taxes or charges which are being contested in good faith by appropriate proceedings and for which adequate reserves have been set aside.

(u)　　Monitoring Borrower.  Pledgor has adequate means of obtaining from sources other than Lender, on a continuing basis, financial and other information pertaining to Borrower's financial condition, the condition (financial and otherwise) of the Project and Borrower's activities relating thereto and the status of Borrower's performance of the Obligations under the Loan Documents, and Pledgor shall keep adequately informed from such means of any facts, events or circumstances which might in any way affect Pledgor's risks hereunder.

(v)    ERISA.  Pledgor is not an "employee benefit plan" (within the meaning of section 3(3) of ERISA) to which ERISA applies and no assets of Pledgor constitute assets of any such plan.

(w)    Regulations U and X.  Pledgor is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Loan will be used for a purpose which violates, or would be inconsistent with Federal Reserve System Board of Governors' Board Regulation U or X (as such terms are used in Federal Reserve System Board of Governors' Board Regulation U or X or any regulations substituted therefor, as from time to time in effect).

(x)    Investment Company.  Pledgor is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(y)    Taxes on Payments.  All amounts payable by Pledgor under the Loan Documents may be made free and clear of, and without deduction for or on account of, any tax.

(z)    Conditions Precedent.  There are no conditions precedent to the effectiveness of this Agreement.

Section 3.2    Representations and Warranties to be Continuing.  Pledgor represents and warrants that all of the representations and warranties in this Agreement are true and correct as of the date hereof and Pledgor will take no action which would cause any of such representations and warranties to fail to be true in all material respects at any time.  All representations and warranties made in this Agreement or in any other document delivered to Lender by or on behalf of Pledgor shall survive the making of the Loan and shall continue in full force and effect until the Release Conditions are fully satisfied.  Pledgor shall promptly inform Lender in writing after discovering any breach of such representations or warranties.

Section 3.3    Acknowledgment of Lender's Reliance.  Pledgor acknowledges that the Loan and each Advance will be made by Lender in reliance upon the representations and warranties of Pledgor contained in this Agreement, and to the extent applicable, the other Loan Documents.  Lender shall be entitled to such reliance notwithstanding any investigation which has been or will be conducted by Lender or on its behalf.

**Section 4.    Other Covenants.**

Pledgor hereby covenants and agrees with Lender as follows:

Section 4.1    No Transfer.  (i) Pledgor shall not transfer, sell, assign, pledge or hypothecate, and shall not cause or consent to any transfer, sale, assignment, pledge or hypothecation any interest in Borrower or any Pledged Collateral or any portion of any of the foregoing and (ii) Pledgor shall not enter into or consent to, or cause any other Person to enter into or consent to, any contract, option, right of first offer, right of first refusal, or other agreement to transfer any interest in Borrower or any Pledged Collateral or any portion of any of the foregoing.

Section 4.2    No Changes to Organizational Documents or Ownership Structures of Borrower.  Pledgor shall preserve and maintain its existence and all of its material licenses, rights, privileges and franchises that are necessary for the fulfillment of its obligations under this Agreement.  Pledgor shall not, and shall not cause Borrower to, (i) cancel or terminate the Borrower Organizational Documents or consent to or accept any cancellation or termination thereof; (ii) amend, supplement or otherwise modify the Borrower Organizational Documents, (iii) petition, request or take any other legal or administrative action that seeks, or may reasonably be expected, to rescind, terminate, amend, modify or suspend the Borrower

Page 8

Organizational Documents; (iv) vote to enable, or take any other action to permit, Borrower to admit any additional Person as a member of Borrower; (v) vote to enable, or take any other action to permit, Borrower to issue any additional membership interests or Voting Rights, or to issue any interests convertible into or granting the right to purchase or exchange for any membership interests or Voting Rights in Borrower; (vi) vote to enable, or take any other action to permit, Borrower to issue any certificate or other writing (other than the Borrower Organizational Documents) to represent Pledgor's membership interest or Voting Rights in Borrower; (viii) perform, authorize or enter into any transaction for the termination, dissolution or winding up of Borrower; (ix) engage in or permit, any act or failure to act constituting a termination, dissolution or winding up of Borrower; (x) allow the merger or consolidation of Borrower with another Person; or (xi) otherwise effect or change the structure or organization of Borrower without the prior written consent of Lender where such consent is required under the Loan Documents.  To the extent that Pledgor is other than a corporation, partnership, limited liability company or similar enterprise (i.e., a natural person), provisions that would only be applicable to such entities shall not apply.

Section 4.4    Single Purpose Entity.  Pledgor shall not cause or consent to any action or failure to act which would result in Borrower failing to be at all times a Single Purpose Entity as required by the Security Instrument.

Section 4.5    "Opt-In".  Pledgor represents and warrants that Borrower has elected to "opt-in" to Article 8 of the UCC.  As a result, the membership interests in Borrower have been certificated and constitute a "security" within Article 8 of the UCC.  Pledgor shall not cause or permit Borrower to terminate Borrower's "opt in" election under Article 8 of the UCC; or cause or permit amendment, modification or other change to Borrower's Organizational Documents without the prior written consent of Lender.

Section 4.6    Compliance with Borrower Organizational Documents.  Subject to any limitations set forth in the Loan Documents, Pledgor shall (i) observe and perform each and every material term, covenant and provision of the Borrower Organizational Documents on the part of Pledgor  to be observed and performed and shall duly and faithfully discharge Pledgor's material obligations under the Borrower Organizational Documents and under each and every agreement, document or instrument relating to Pledgor's right to receive the Pledged Collateral; and (ii) take all steps required to enforce the rights of Pledgor under the Borrower Organizational Documents.

Section 4.7    Intentionally Omitted.

Section 4.8    No Change of Business.  Pledgor shall not change its name or the name under which it does business from the name by which Pledgor is identified in this Agreement.

Section 4.9    No Other Filings.  Pledgor shall not file or suffer to be on file, or authorize or permit to be filed or to be on file, in any jurisdiction, any financing statement or like instrument with respect to the Pledged Collateral other than the financing statement(s) delivered to Lender.

Section 4.10    Defense of Title.  Pledgor will use its commercially reasonable efforts to defend Lender's right, title and interest in, to and under the Pledged Collateral against the claims and demands of all Persons whomsoever (other than those claiming through Lender).

Section 4.11    Authorization to File.  Pledgor hereby authorizes Lender to file one or more financing or continuation statements and amendments thereto relating to all or part of the Pledged Collateral without Pledgor's signature.  A photocopy or other reproduction of this Agreement shall be sufficient as a financing statement.

Section 4.12    Taxes.  Pledgor shall pay and discharge all taxes now or hereafter imposed on the Pledged Collateral prior to the date on which penalties attach thereto; provided that Pledgor shall have the right to contest the validity or amount of any such tax in good faith and by proper proceedings and against which adequate reserves are being maintained.  Pledgor shall promptly pay any valid, final judgment enforcing any such tax and cause the same to be satisfied of record.

Section 4.13    Notice.  Pledgor shall give Lender notice of the following events immediately after Pledgor becomes aware of such events: (i) the occurrence of any event which would cause a dissolution of Pledgor or Borrower, or (ii) any action or proceeding which is commenced, filed or initiated with respect to or affecting the Pledged Collateral.

Section 4.14    Certificates.  If Pledgor shall, as a result of its ownership of the Pledged Collateral, become entitled to receive or shall receive any certificate (including, without limitation, any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate or equity interest issued in connection with any reorganization), options, warrants or other rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any part of the Pledged Collateral, or otherwise in respect thereof, Pledgor shall accept the same as Lender's agent, hold the same in trust for Lender and deliver the same forthwith to Lender in the exact form received, duly endorsed by Pledgor to Lender, or in blank, as Lender may require, together with an undated power covering such certificate duly executed in blank and with, if Lender so requests, signature guaranteed, to be held by Lender hereunder as additional Collateral security for the Obligations.  Any sums paid upon or in respect of the Pledged Collateral upon the liquidation or dissolution of Borrower shall be paid over to Lender to be held by Lender hereunder as additional collateral security for the Obligations, and in case any distribution of capital shall be made on or in respect of any part of the Pledged Collateral or any property shall be distributed upon or with respect to any part of the Pledged Collateral pursuant to the recapitalization or reclassification of the capital of Borrower or pursuant to the reorganization thereof, the property so distributed shall be delivered to Lender to be held by it, subject to the terms hereof, as additional collateral security for the Obligations.  If any sums of money or property so paid or distributed in respect of the Pledged Collateral shall be received by Pledgor, Pledgor shall, until such money or property is paid or delivered to Lender, hold such money or property in trust for Lender, segregated from other funds of Pledgor, as additional collateral security for the Obligations.

**Section 5.    Waivers, Acknowledgements and Consents.**

Section 5.1    Rights of Lender.  Pledgor authorizes Lender, after the occurrence of an Event of Default, to perform any or all of the following acts, to the extent permitted by applicable law, at any time in its sole discretion, all without notice to Pledgor, without affecting Pledgor's obligations under this Agreement or any other Loan Documents and without affecting the liens and encumbrances against the Pledged Collateral in favor of Lender:

(a)    Lender may alter any terms of the Obligations or any part thereof, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Obligations or any part thereof.

(b)    Lender may take and hold security for the Obligations, accept additional or substituted security, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect and sell or otherwise dispose of any such security.

(c)    Lender may direct the order and manner of any sale of all or any part of any security now or later to be held for the Obligations, and Lender (or its nominees or designees) may also bid at any such sale.

(d)    Lender may apply any payments or recoveries from Borrower, Pledgor or any other source, and any proceeds of any security, to the obligations under the Loan Documents in such manner, order and priority as Lender may elect.

(e)    Lender may release any Person or entity of its liability for the Obligations or any part thereof.

(f)    Lender may substitute, add or release any one or more guarantors or endorsers.

(g)    In addition to the Obligations, Lender may extend other credit to Borrower, and may take and hold security for the credit so extended, all without affecting Pledgor's liability hereunder or under the other Loan Documents and without affecting the liens and encumbrances against the Pledged Collateral hereunder or under the other Loan Documents.

Section 5.2    <u>Absolute Obligations</u>.    Pledgor expressly agrees that until all Obligations are indefeasibly satisfied, Pledgor shall not be released of its obligations, waivers and agreements set forth herein or in any other Loan Document nor shall the validity, enforceability or priority of the liens and encumbrances against the Pledged Collateral in favor of Lender be affected in any manner by or because of:

(a)    Any act or event which might otherwise discharge, reduce, limit or modify Pledgor's obligations hereunder or under the other Loan Documents or the liens and encumbrances against the Pledged Collateral in favor of Lender;

(b)    Any waiver, extension, modification, forbearance, delay or other act or omission of Lender or any failure to proceed promptly or otherwise as against Borrower, Pledgor, or any other Person or entity or any security;

(c)    Any action, omission or circumstance which might increase the likelihood that Lender might enforce the rights granted under this Pledge Agreement or under the other Loan Documents or which might affect the rights or remedies of Pledgor as against Borrower; or

(d)    Any dealings occurring at any time between Borrower and Lender, whether relating to the Obligations or otherwise.

(e)    Pledgor hereby expressly waives and surrenders any defense to the performance of the obligations under this Pledge Agreement and under all other Loan Documents or to the enforcement of the liens and encumbrances against the Pledged Collateral in favor of Lender based upon any of the foregoing acts, omissions, agreements, waivers or matters described in this subsection.

5.3    <u>Acknowledgements</u>.

(a)    Pledgor acknowledges and agrees that Pledgor has had the benefit of legal counsel in connection with the execution and delivery of this Agreement and Pledgor has not executed and delivered this Agreement under any fraud, duress, undue influence or coercion of any kind.

(b)    Pledgor acknowledges that the obligations of Pledgor under this Agreement shall not be affected by the value, genuineness, validity, regularity or enforceability of the Note or any other Loan Document, or any substitution, release or exchange of any other guarantee of or security for any of the Obligations, and shall remain in effect to the fullest extent permitted by Applicable Law.

     (c)     The occurrence of any one or more of the following shall not alter or impair the pledge of the Pledged Collateral pursuant to this Agreement, which shall remain effective notwithstanding any of the following, and none of the following shall alter or impair any of Pledgor's obligations under this Agreement or the enforceability of this Agreement:

     (i)     at any time or from time to time, without notice to Pledgor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

     (ii)     any of the acts mentioned in any of the provisions of the Note or any other Loan Document shall be done (excluding the irrevocable payment in full of the Debt) or omitted;

     (iii)     the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under the Note or any other Loan Document shall be waived or any guarantee of any of the Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

     (iv)     any lien or security interest granted to, or in favor of, Lender as security for any of the Obligations shall fail to be perfected.

     Section 5.4    <u>Waivers</u>.    Pledgor hereby expressly waives, to the extent permitted under Applicable Law:

     (i)     Notice of the acceptance by Lender of this Agreement, notice of the existence, creation or non-payment of any of the Obligations, presentment, demand, notice of dishonor, protest, notice of protest, and all other notices except any specifically required by this Agreement;

     (ii)     Any obligation Lender may have to disclose to Pledgor any facts Lender now or hereafter may know or have reasonably available to it regarding any Obligor or such Obligor's financial condition, whether or not Lender has a reasonable opportunity to communicate such facts or has reason to believe that any such facts are unknown to Pledgor or materially increase the risk to Pledgor beyond the risk Pledgor intends to assume hereunder. Pledgor shall be fully responsible for keeping informed of the financial condition of each other Obligor and of all other circumstances bearing on the risk of non-payment or non-performance of the Obligations;

     (iii)     All diligence in collection of any of the Obligations, any obligation hereunder, or any guaranty or other security for any of the foregoing;

     (iv)     The benefit of all appraisement, valuation, forbearance or homestead laws now or hereafter in effect, or any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respect more burdensome than that of a principal;

     (v)     Any defense based on any statute of limitations;

     (vi)     Any defense based upon Lender's election, in any proceeding instituted under the Bankruptcy Code, under Section 1111(b)(2) of the Bankruptcy Code, or any defense based upon any borrowing or any grant of a security interest under Section 364 of the Bankruptcy Code;

     (vii)     The lack of validity, genuineness or enforceability of the Loan Documents (or any of them) between Lender and any Obligor or any other Person;

(viii)    Any defense relating to any departure from the terms of the Loan Documents by Lender, any Obligor or any other Person;

(ix)    Any defense based upon the application by any Obligor of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender or intended or understood by Lender or such Obligor;

(x)    Any defense based on the incapacity, lack of authority, death or disability of any Person or the failure of Lender to file or enforce a claim against the estate of any Person in any administrative, bankruptcy or other proceeding;

(xi)    Any defense based on an election of remedies by Lender, whether or not such election may affect in any way the recourse, subrogation or other rights of Pledgor against any Obligor or any other Person in connection with the Obligations;

(xii)    Intentionally omitted;

(xiii)    Any defense based on the negligence of Lender in administering the Loan, or taking or failing to take any action in connection therewith;

(xiv)    Any defense based on any change to the Project or the use of the Project made without the consent or knowledge of Pledgor;

(xv)    Any defense based on Lender's exercising its rights under the Security Instrument, Guaranty or any other Loan Document;

(xvi)    Any defense based upon any legal disability, incapacity or other personal defense of Borrower or any other Obligor, or by reason of the cessation or limitation of the liability of Borrower or any other Obligor from any cause other than full irrevocable payment and performance of all Obligations under the Note or any of the other Loan Documents;

(xvii)    Any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of Borrower or any other Obligor or any defect in the formation of Borrower or any other Obligor; and

(xviii)    Any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal and all other suretyship defenses of every kind and nature.

Section 5.5    <u>Independent and Primary</u>.  The obligations of Pledgor under this Agreement are independent and primary.  Lender shall not be required to seek payment of the Obligations from Borrower or any other Obligor or any other Person prior to exercising Lender's rights and enforcing Lender's remedies under this Agreement and the other Loan Documents.  It shall not be necessary for Lender, in order to exercise Lender's rights and enforce Lender's remedies under this Agreement against Pledgor, (i) to first institute suit or exhaust Lender's remedies against (A) the Project, (B) any other collateral given as security for the Loan or (C) Borrower, any Guarantor or any other Obligor or any other Person, or (ii) to have joined with Pledgor, in any suit or action brought to enforce this Agreement or any of the other Loan Documents, Borrower, any Guarantor or any other Obligor or any other Person.  However, in the event Lender elects in Lender's sole discretion to enforce and/or exercise any remedies it may possess with respect to the Project or the other Loan Documents or any other security for the Obligations prior to exercising its rights hereunder, Pledgor shall nevertheless remain obligated hereunder to the extent of the Obligations not

paid or recovered incident to the exercise of such remedies.  Pledgor agrees that, as between Pledgor and Lender, the obligations of Borrower under the Loan Documents may be declared to be forthwith due and payable as provided in the Loan Documents notwithstanding any stay, injunction or other prohibition preventing such declaration as to Borrower (or such Obligations from becoming automatically due and payable) as against Borrower and that, in the event of such declaration (or such Obligations being deemed to have become automatically due and payable), Lender may pursue Lender's rights pursuant to this Agreement as if the Obligations were due and payable in full as to Borrower.

Section 5.6    Dealings With Obligors and Other Persons.  The obligations of Pledgor hereunder shall not be released, discharged, limited or affected in any manner by anything done, suffered or permitted by Lender in connection with its dealings with any Obligor or any other Person.  Without limiting the foregoing, it is agreed that, without releasing, discharging, limiting or otherwise affecting in whole or in part Pledgor's obligations hereunder, Lender may from time to time without notice to or consent of Pledgor:

(i)    Grant time, renewals, extensions, indulgences, releases, waivers, modifications or discharges to any Obligor.

(ii)    Otherwise extend, amend, modify, supplement, subordinate, settle, compromise or exchange any of the Obligations or any of the Loan Documents or any term, condition or provision thereof.

(iii)    Release any Obligor from any of the Obligations.

(iv)    Take or abstain from taking security or collateral from any Obligor or any other Person, or release, substitute or add any one or more Obligors of any of the Obligations, or otherwise modify, subordinate, exchange or release its security interest or lien on any security or collateral for any of the Obligations.

(v)    Take, or delay in taking or refusing to take, any and all action with respect to this Agreement or the other Loan Documents (regardless of whether the same might vary the risk or alter the rights, remedies or recourses of any Pledgor), including specifically (but without limitation) the settlement or compromise of any amount allegedly due thereunder.

(vi)    Accelerate the Loan, foreclose on, take possession of or sell any of the collateral or security for the Obligations or enforce any other rights under any other Loan Document, or decline or fail to do any of the foregoing.

(vii)    Otherwise deal with any Obligor as Lender may see fit.

Section 5.7    Other Events Not Affecting Obligations of Pledgor.  Pledgor acknowledges and agrees that the obligations of Pledgor shall not be released, discharged, limited or affected  by any of the following:  (i) the insolvency of, or voluntary or involuntary bankruptcy, assignment for the benefit of creditors, reorganization or other similar proceedings affecting any Obligor or any other Person; (ii) the release or discharge of any Obligor or any other Person in any creditors', receivership, bankruptcy, reorganization, insolvency, or other proceeding; (iii) the rejection or disaffirmance in any such proceeding of any of the Obligations; (iv) the impairment, modification, alteration or extension of any of the Obligations, or of any remedy for the enforcement thereof, or of the estate of any Obligor or any other Person in bankruptcy, or any stay in the enforcement of the Obligations against any Obligor or any other Person, resulting from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (v) any disability or defense of any Obligor or any other Person; (vi) the cessation of the liability of any Obligor or any other Person for any

cause whatsoever other than following payment in full to Lender of the Loan and all amounts due in connection therewith; (vii) Lender's application of all monies at any time received from Borrower or any Obligor upon such part of the Obligations as Lender may see fit (subject to the requirements of the Loan Documents); or (viii) the release, substitution or addition of any one or more endorsers of the Note or Obligors for any of the Obligations.  Pledgor further acknowledges and agrees that (i) the occurrence of any of the foregoing shall not prevent, prohibit or delay any action by Lender under this Agreement to realize on the Pledged Collateral and apply the same against the Obligations (as such Obligations existed without giving effect to any of the foregoing clauses); and (ii) Pledgor's efforts are not necessary for a successful reorganization or rehabilitation of any other Obligor or any such other Person.  Pledgor waives any right to seek a stay or injunction of any proceeding against Pledgor with respect to this Agreement or any action to realize upon or sell the Pledged Collateral whether based on Section 105 of the Bankruptcy Code or otherwise.

Section 5.8    Consent.  Reference is made to the Guaranty.  Pledgor hereby consents to such Guaranty, the terms and provisions thereof and the exercise by Lender of its rights and remedies thereunder (without obtaining the further or additional consent or approval of Pledgor or any other Person).

**Section 6.    Responsibility of Lender.**

Section 6.1    Lender Has No Duty.  The powers conferred on Lender hereunder are solely to protect its interest in the Pledged Collateral and shall not impose any duty upon it to exercise or refrain from exercising any such powers.  Pledgor acknowledges that by entering into this Agreement and accepting the pledge of the Pledged Collateral, Lender has not therefore assumed any liability or responsibility for the Project or any portion thereof.  Lender shall not be required to take any action hereunder in respect of an Event of Default or any other event or circumstance.  Lender shall be under no obligation to take any steps necessary to preserve rights in the Pledged Collateral against any prior parties, but may do so at its option and all reasonable expenses incurred in connection therewith shall be for the account of Pledgor, and shall be added to the Debt secured hereby.

Section 6.2    Lender Not Liable.  In no event shall Lender be liable to Pledgor for any matter or thing in connection with this Agreement (including, without limitation, any acts, omissions, errors of judgment or mistakes of fact or law) other than to account to Pledgor for monies actually received by Lender in accordance with the terms hereof and expenses directly suffered and incurred by Pledgor as a result of any state of facts determined by a final non-appealable judgment of a court of competent jurisdiction to be caused by Lender's gross negligence or willful misconduct or breach of this Agreement.  Without limiting the foregoing, Lender shall not be liable for the consequence of any Voting Rights cast or given by Lender in good faith from and after the Exercise Date, and Pledgor acknowledges and agrees that the exercise of the Voting Rights by Lender from and after the Exercise Date with the objective of protecting Lender's rights or interest in the Pledged Collateral or allowing Lender to pursue its remedies under the Loan Documents shall be deemed to be cast or given in good faith.  The trustees, officers, directors, employees and agent of Lender shall have no personal liability under this Agreement.

Section 6.3    Reasonable Care.  Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Pledged Collateral in its possession if such Pledged Collateral is accorded treatment substantially equal to that which Lender accords its own property.  Further, and without limiting the foregoing, Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Pledged Collateral, if it takes such action for that purpose as Pledgor reasonably requests in writing, but failure of Lender to comply with any such request at any time shall not be deemed a failure to exercise reasonable care and there is no duty or obligation of Lender to comply with such instructions.

Section 6.4    <u>Lender may Perform</u>.  If Pledgor shall fail to do any act or thing which it has covenanted to do hereunder or if any representation or warranty of Pledgor shall be breached, Lender may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach and the reasonable cost or expense incurred by Lender in so doing shall be payable by Pledgor on demand, with interest at the Default Rate (as provided in the Note) from the date incurred to the date paid.

Section 6.5    <u>Indemnity</u>.  In furtherance of the provisions of this <u>Section 6</u> and the other terms and provisions of this Agreement, Pledgor hereby agrees to indemnify and hold harmless Lender (to the full extent permitted by Applicable Law) from and against any and all claims, demands, losses, judgments and liabilities (including liabilities for penalties and transfer taxes) of whatever nature arising out of or in connection with this Agreement or the grant of the security interests created hereby or the administration or enforcement of any right or remedy granted to Lender hereunder, except any costs and expenses arising out of the negligence, willful misconduct of or breach of this Agreement by Lender.

**Section 7.    <u>Events of Default</u>.**

Section 7.1    <u>Events of Default</u>.  Any one or more of the events or conditions herein below set forth shall constitute an "***Event of Default***" hereunder (without, except as expressly set forth below or the Loan Documents (as applicable), any notice, cure or grace period):

(a)    any material violation, default or breach by Pledgor under this Agreement and the same shall continue for a period of 30 days after written notice from Lender; or

(b)    the occurrence of any event or matter which under the terms of <u>Section 5</u> of the Note constitutes an "Event of Default" or the occurrence of any other event, occurrence or circumstance constituting an "Event of Default" under any of the Loan Documents.

**Section 8.    <u>Remedies</u>.**

Section 8.1    <u>Certain Remedies</u>.  Upon the occurrence of any Event of Default, in addition to all rights Lender has under the other Loan Documents and Applicable Law, Pledgor agrees Lender may (but without any obligation to do so) take such action, upon 30 days prior written notice (or such longer time required by Applicable Law), as Lender deems advisable or appropriate to protect and enforce its rights against Pledgor and in and to the Pledged Collateral, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole and absolute discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(i)    Lender shall have the right, without any further action or consent of Pledgor or any other Person, to immediately (a) direct Borrower ("***Borrower Direction***") to identify Lender or Lender's designee, on the books and records of Borrower, as the sole member of Borrower in full substitution of Pledgor and (b) otherwise take and cause Borrower to take all other steps required to identify Lender or such designee as the sole and exclusive owner of the Pledged Collateral.  In furtherance thereof, Pledgor hereby irrevocably authorizes and directs Borrower on receipt of any Borrower Direction (a) to admit Lender or such designee as the sole member of Borrower in substitution of Pledgor, entitled to exercise all the rights, powers and privileges (including Voting Rights, the right to receive all distributions and be credited with the capital account of Pledgor, the right to participate in the management and operation of Borrower, all rights in, to and under the Borrower Organizational Documents, including any purchase option, right of first refusal, right of first offer and buy/sell right and the right to exercise all other powers and privileges appertaining to such membership interests) to which Pledgor would have been entitled had Lender not delivered the Borrower Direction and (b) to file an amendment to the Borrower Organizational

Documents admitting Lender or such designee as the sole member in substitution of Pledgor; provided, however, no such amendment shall be necessary or required to effectuate, implement or activate Lender rights under this Agreement or Lender's rights as owner and successor-in-interest to all of Pledgor's rights in, to and under the Pledged Collateral.  Pledgor acknowledges that sending of the Borrower Direction and the compliance by Pledgor or Borrower with the requirements hereof would not violate any automatic stay that may be in effect under any Bankruptcy Law.

(ii)     If and to the extent permitted by the Uniform Commercial Code, from and after the Exercise Date, immediately upon giving the Exercise Notice to Pledgor and Borrower, Lender shall have the sole and exclusive right to exercise, in person or by its nominees or proxies, all Voting Rights, either on behalf of Pledgor or in Lender's own name.  Lender shall be entitled to exercise such Voting Rights in such manner as Lender determines in its sole and absolute discretion, including (A) causing Borrower to perform its obligations under the Loan Documents or (B) intentionally omitted or (C) not contesting the exercise of remedies under the Loan Documents or contesting or not contesting the exercise of remedies under the Senior Loan Documents.  Immediately upon Lender's giving the Exercise Notice to Pledgor and Borrower, no further action or direction shall be required to permit Lender to exercise the Voting Rights hereunder, Lender shall have, and Pledgor and Borrower shall recognize Lender as having, the immediate right to exercise all of the Voting Rights of Pledgor and Pledgor shall cease to have such rights. Pledgor acknowledges that sending of the Exercise Notice and the compliance by Pledgor with the other requirements hereof would not violate any automatic stay that may be in effect under any Bankruptcy Law.  Lender shall not be liable for the consequence of any Voting Rights cast or given in good faith, and Pledgor acknowledges and agrees that the exercise of the Voting Rights by Lender with the objective of protecting Lender's rights or interest in the Pledged Collateral shall be deemed to be cast or given in good faith.

(iii)     Lender shall have all of the rights and remedies of a secured party under the Uniform Commercial Code or the comparable law of any other jurisdiction whose laws are applicable under the Loan Documents, and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, and in accordance with the terms hereof, to exercise all Voting Rights and other management, consensual and other powers of ownership pertaining to the Pledged Collateral (and Pledgor agrees to take all such reasonable action as may be appropriate to give effect to such right).  In the exercise of such rights and remedies Lender may, without notice except as specified below, sell the Pledged Collateral or any part thereof at one or more public or private sales held at Lender's offices at the address set forth above or elsewhere (including the offices of Lender's attorneys located in Los Angeles, California) for cash, on credit or for future delivery, and/or upon such other terms as Lender may deem reasonable.  Pledgor agrees that 30 days' prior notice (or such other time period as required by applicable law) to Pledgor of the time and place of any public sale or the time after which any private sale is to be made and the terms on which such sale will be made shall constitute reasonable notification.  Lender shall not be obligated to sell any of the Pledged Collateral regardless of notice of sale having been given.  Any such sale shall be made (to the extent permitted by Applicable Law) absolutely free of any claim or right of Pledgor of whatsoever kind, including any right or equity of redemption (statutory or otherwise).  To the extent permitted by Applicable Law, Lender shall be entitled to bid in at any such sale all or any portion of its Debt (as it shall determine in its reasonable discretion) and if Lender shall be the successful bidder it shall credit its bid against the Debt in such priority and amounts as Lender in its sole and absolute discretion shall determine.  Any person or persons (including Lender or its designee) who become the Owner of the Pledged Collateral or any portion thereof at any such public or private sale is hereinafter called a "***Successful Bidder,***" and a Successful Bidder shall be entitled to give the Borrower Direction set forth in Section 8.1(i), whereupon (to the extent of the Pledged Collateral sold to it at such public or private sale) such Successful Bidder shall be entitled to all rights set forth therein as though each reference to Lender were to such Successful Bidder.

Page 17

(iv)     In its own name or in the name of Pledgor, Lender may ask for, demand, collect, sue for, recover, compromise, receive and give any acquittances and receipts for monies due or to become due under or in respect of any of the Pledged Collateral (including, without limitation, any distributions at any time payable or receivable on account of or in exchange for any of the Pledged Collateral) and hold the same as part of the Pledged Collateral, or apply the same to any of the Obligations in such manner as Lender may direct in its sole discretion.

(v)     Lender may receive, endorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (iv) above (including, without limitation, all instruments representing dividends, interest payments or other distributions in respect of the Pledged Collateral or any part thereof and give full discharge for the same).

(vi)     Lender may enter into any extension, subordination, reorganization, deposit, merger, or consolidation agreement, or any other agreement relating to or affecting the Pledged Collateral, and in connection therewith deposit or surrender control of such Pledged Collateral thereunder, and accept other property in exchange therefor and hold and apply such property or money so received in accordance with the provisions hereof.

(vii)     Lender may discharge any taxes or liens levied on the Pledged Collateral or pay for the maintenance and preservation of the Pledged Collateral; the amount of such payments, plus any and all reasonable fees, costs and expenses of Lender (including reasonable attorneys' fees and disbursements) in connection therewith, shall, at Lender's option, be reimbursed by Pledgor on demand.

(viii)     Lender may perform, or cause the performance of, any of the obligations of Pledgor hereunder, in each case in its own name or in the name of Pledgor.

(x)     Lender, in its own name or in the name of Pledgor, shall have the right, without the consent of Pledgor or any Obligor, to terminate and/or remove any manager of Borrower upon notice to such manager (with such termination and/or removal being effective immediately upon such written notice) and to replace such manager with Lender's nominee or designee (or with Lender).  Neither Borrower nor Lender nor any Successor Bidder shall have any obligation whatsoever to such terminated and/or removed manager.

Section 8.2    Additional Provisions Regarding Sale of Pledged Collateral.

(a)     No Obligation to Register.  Lender may be unable to sell the Pledged Collateral publicly without registration under the Securities Laws, which would likely be an expensive and time-consuming undertaking and, in fact, one which might be impossible to accomplish even if Lender were willing to invest the necessary time and money.  Lender may be able to register the Pledged Collateral under the Securities Laws, but may regard such registration as too expensive or too time-consuming.  If Lender sells the Pledged Collateral without registration, Lender may be required to sell them only in private sales to a restricted group of offerees and purchasers who fulfill or satisfy certain suitability standards and who will be obliged to agree, among other things, to acquire the Pledged Collateral for their own account for investment and not with a view to distributing or reselling them.  Such a private sale may result in less favorable prices and other terms than a public sale.  Pledgor recognizes, acknowledges and accepts these realities and hereby consents and waives any claim it may have against Lender or any other Person as a result of the sale of the Pledged Collateral at a private sale conducted in accordance with all applicable provisions of this Agreement as opposed to a public sale.  Lender shall incur no liability as a result of the sale of the Pledged Collateral, or any part thereof, at any private sale pursuant to this Section 8.2(a) if conducted in a commercially reasonable manner.

(b)    <u>Right of Lender to Purchase at No-Action Public Sale</u>.  Pledgor is aware that Article 9 of the Uniform Commercial Code places certain limitations on a secured party's right to purchase the Pledged Collateral at a private sale following default.  Pledgor is also aware that SEC staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the Uniform Commercial Code, yet not public for purposes of Section 4(2) of the Securities Act.  Pledgor is also aware that Lender may wish to purchase the Pledged Collateral at foreclosure sale and Pledgor believes that such purchases would be appropriate in circumstances in which the Pledged Collateral is sold in conformity with the principles set forth in such No-Action Letters.  Article 9 of the Uniform Commercial Code permits Pledgor to agree on the standards for determining whether Lender has complied with its duties in connection with the enforcement of its rights and remedies under Article 9 following a default.  Pursuant to the applicable provisions of Article 9 of the Uniform Commercial Code, Pledgor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale following default for purposes of Article 9 of the Uniform Commercial Code; (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Pledged Collateral under the Securities Laws, even if Pledgor or  any other Obligor agrees to pay all costs of the registration process; and (iii) shall be considered to be commercially reasonable notwithstanding that Lender purchases the Pledged Collateral at such a sale.

(c)    <u>Commercially Reasonable</u>.  Without limiting the definition of "commercially reasonable," Pledgor further agrees that the following shall be deemed "commercially reasonable" as such term is used in the Uniform Commercial Code or deemed applicable to any sale of the Pledged Collateral: (i) the sale by Lender of a portion of the Pledged Collateral, or any percentage interest in the Pledged Collateral, at the same or different private or public sales or at the same or different times; (ii) the sale of the Pledged Collateral together with the sale of other interests that may be pledged by other entities at the same or different private or public sales or at the same or different times;  (iii) the sale of that portion of the Pledged Collateral representing the right to receive Distributions either separate from, or together with, any other portion of the Pledged Collateral or the sale of such interests at different private or public sales or at the same or different times; and (iv) the sale of the Pledged Collateral at any time or place permitted by this Agreement and Applicable Law.

(d)    <u>General Standards Applicable to Sales</u>.  Pledgor agrees that Lender shall not have any general duty or obligation to make any effort to obtain any particular price for any Pledged Collateral sold by Lender pursuant to this Agreement.  Lender shall not incur any liability as a result of the sale of the Pledged Collateral, or any part thereof, at any private sale conducted in accordance with this Agreement and Applicable Law. Lender may, in its discretion, among other things, accept the first offer received, or decide to approach or not to approach any potential purchasers.  Pledgor hereby waives any claims against Lender by reason of the fact that the price at which the Pledged Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations.

(e)    <u>Additional Acts</u>.  If any consent, approval or authorization of, or filing with, any Governmental Authority or any other Person shall be necessary to effectuate any sale or other disposition of the Pledged Collateral, or any partial disposition of the Pledged Collateral, including, without limitation, any such consent under any federal or state securities laws, Pledgor agrees to execute all such applications, registrations and other documents and instruments as are appropriate and may be reasonably required in connection with securing any such consent, approval or authorization, and will otherwise use its commercially reasonable efforts to secure the same.  Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts and things as may be reasonably necessary to make any sale or sales of Pledged Collateral valid and binding and in compliance with Applicable Law.  Notwithstanding anything expressed or implied herein to the contrary, Pledgor shall not be obligated, entitled or authorized

at any time to register any Pledged Collateral under any Securities Laws.

       (f)    <u>Use of Third Parties</u>.  Lender may elect to obtain the advice of an independent investment banking firm with respect to the method and manner of sale or other disposition of any of the Pledged Collateral, the best price reasonably obtainable therefor, the consideration of cash and/or credit terms, or any other details concerning such sale or disposition.

       (g)    <u>Transfer of Title</u>.  Upon any sale or other disposition conducted in accordance with Applicable Law, Lender shall have the right to deliver, endorse, assign and transfer to the purchaser thereof the Pledged Collateral so sold or disposed of.  Each purchaser at any such sale or other disposition, including Lender, shall hold the Pledged Collateral free from any claim or right of whatever kind, including any equity or right of redemption.

       (h)    <u>No Obligation</u>.  Lender shall not be obligated to make any sale or other disposition unless the terms thereof shall be satisfactory to it.  Lender may, without notice or publication, adjourn any private or public sale, and, upon 30 days' prior notice to Pledgor, hold such sale at any time or place to which the same may be so adjourned.  In case of any sale of all or any part of the Pledged Collateral, on credit or future delivery, the Pledged Collateral so sold may be retained by Lender until the selling price is paid by the purchaser thereof, but Lender shall incur no liability in case of the failure of such purchaser to take up and pay for the property so sold and, in case of any such failure, such property may again be sold as herein provided.

       (i)    <u>Waiver of Claims</u>.  Pledgor hereby waives any claim it may have with respect to any liability, damages, losses or other consequences incurred by Pledgor from the sale of the Pledged Collateral in accordance with applicable law.

       Section 8.3    <u>Enforcement Costs</u>.  Pledgor shall reimburse Lender for any and all out-of-pocket costs incurred by Lender in taking any action pursuant to this Agreement against Pledgor or to enforce any of Lender's rights hereunder against Pledgor or the Pledged Collateral, including, professional fees, advertising and auction fees, and transfer taxes.  All such costs and expenses shall be repayable to Lender within 30 days following demand, with interest at the Default Rate from the date incurred by Lender to the date paid.

       Section 8.4    <u>Application of Proceeds</u>.  The proceeds of any disposition of the Pledged Collateral, or any part thereof, or any other sums collected by Lender pursuant hereto, may be applied by Lender (after payment of any amounts payable to Lender pursuant to Section 8.3 hereof) to the payment of the Debt or any part thereof in such priority and amounts as Lender in its sole and absolute discretion shall determine.  Any surplus thereafter remaining shall be paid to Pledgor, subject to the rights of any holder of a lien on the Pledged Collateral of which Lender has actual notice.

       Section 8.5    <u>Remedies Cumulative</u>.  No remedy or right of Lender hereunder, under any of the Loan Documents or otherwise available under Applicable Law or in equity, shall be exclusive of any other right or remedy.  Each such remedy or right shall be in addition to every other remedy or right now or hereafter existing under Applicable Law or in equity.  Every remedy or right may be exercised concurrently or independently and when and as often as may be deemed necessary or appropriate by Lender in its sole and absolute discretion.

       Section 8.6    <u>Attorney-in-Fact</u>.  Without limiting any rights or powers granted by this Agreement to Lender prior to an Event of Default, upon the occurrence of any Event of Default, Lender is hereby appointed the attorney-in-fact of Pledgor for the purpose of executing any instrument that Lender reasonably deems necessary or advisable to confirm the transfer of any of the Pledged Collateral transferred

pursuant to a sale conducted in accordance with this Agreement and Applicable Law, including, without limitation, to affix to certificates and documents representing any Pledged Collateral the endorsements or other instruments of transfer or assignment delivered with respect thereto and to transfer or cause the transfer of the Pledged Collateral, or any part thereof, on the books of Borrower to Lender or its nominee. The power of attorney granted pursuant to this Agreement and all authority hereby conferred are granted and conferred solely to protect Lender's interest in the Pledged Collateral and shall not impose any duty upon Lender to exercise any power.  This power of attorney shall be irrevocable as one coupled with an interest for so long as the Release Conditions are unsatisfied and shall be automatically revoked upon satisfaction of the Release Conditions.

Section 8.7      No Waiver of Rights by Lender.  No failure on the part of Lender or any of its agents to exercise or refrain from exercising any available rights, and no course of dealing with respect to any right, power or remedy hereunder, shall operate as a waiver thereof, and no single or partial exercise by Lender or any of its agents of any right, power or remedy hereunder shall preclude any other or further exercise thereof, and the exercise of any other right, power or remedy provided herein is cumulative and not exclusive of any remedies provided by law.  No action of Lender permitted hereunder shall in any way impair or otherwise affect any right of Lender or obligation of Pledgor under this Agreement.  Lender shall not be liable in any way for any decrease in the value or marketability of any property or collateral securing any of the Obligations which may result from any action or omission of Lender in enforcing any part of this Agreement.

Section 8.8      Bankruptcy Law.  Nothing herein shall be deemed to be a waiver of any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provision under Bankruptcy Law to file a claim for the full amount of the indebtedness of the Loan and other amounts due under the Loan Documents or to require that all of the Pledged Collateral shall continue to secure the Obligations.

**Section 9.      Release.**

Section 9.1      Release Conditions.  Subject to Section 9.2 of this Agreement, the terms and provisions hereof and the security interests created hereunder shall in all respects be a continuing agreement, and shall remain in full force and effect (notwithstanding, without limitation, that from time to time all Obligations may have been satisfied in full) until all of the following have occurred ("***Release Conditions***"): (a) the Debt has been paid and satisfied in full and all other Obligations then due and payable have been paid in full.  Thereafter, upon the written request of Pledgor, Lender shall promptly (but in no event longer than 30 days) execute and deliver to Pledgor an instrument or instruments (including appropriate Uniform Commercial Code termination statements), reasonably satisfactory to Pledgor, acknowledging the satisfaction and termination of such pledge, and will duly assign, transfer and deliver to Pledgor such of the Pledged Collateral as may be in the possession of Lender and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement, together with any moneys at the time held by Lender hereunder.  In the event that any part of the Pledged Collateral is sold in connection with a sale permitted by terms of this Agreement or the Loan Documents or is otherwise released at the direction of Lender pursuant to this Agreement, and the proceeds of such sale or sales or from such release are to be applied in accordance with the terms of this Agreement or the other Loan Documents, to the extent required to be so applied, Lender, at the request and reasonable expense of Pledgor, will release such Pledged Collateral from this Agreement, and will duly assign, transfer and deliver to Pledgor such of the Pledged Collateral as is then being (or has been) so sold or released and as may be in possession of Lender and has not theretofore been released pursuant to this Agreement.

Section 9.2      Rescinded or Returned Payments.  If at any time all or any part of any payment made by Borrower or any other Loan Party in connection with any Loan Document is rescinded, returned or Lender is otherwise required to hold such payment in trust for or otherwise return the payment to another

Person, for any reason whatsoever (including the insolvency, bankruptcy or reorganization of any Loan Party or any other Person), then the Obligations of Borrower or such other Loan Party shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence notwithstanding such previous payment, and the obligations of Pledgor and the rights of Lender under this Agreement, including the security interests created hereby, shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment had never been made.

**Section 10.    Miscellaneous.**

      Section 10.1    <u>Lender Consent and Approval</u>.  Except as may otherwise be expressly provided to the contrary, wherever pursuant to the this Agreement Lender exercises any right given to it to consent or not consent, or to approve or disapprove, or any arrangement or term is to be satisfactory to Lender or Lender is otherwise entitled to exercise its judgment or discretion, the decision of Lender to consent or not consent, or to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory or otherwise to exercise its judgment or discretion, shall be in the sole and absolute discretion of Lender and shall be final and conclusive.

      Section 10.2    <u>Reasonableness</u>.  If at any time Pledgor believes that Lender has not acted reasonably in granting or withholding any approval or consent under the Loan Documents or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise with respect to the Loan, as to which approval or consent either Lender has expressly agreed to act reasonably, or absent such agreement, a court of law having jurisdiction over the subject matter would require Lender to act reasonably, then Pledgor and each Loan Party shall be entitled to seek injunctive relief, specific performance, and declaratory relief but shall not be entitled to recover damages from Lender unless Lender's actions were not taken in a manner that pursued a legitimate business purpose of Lender without violating Lender's duty of good faith and fair dealing.

      Section 10.3    <u>Sole Discretion of Lender</u>.  Whenever pursuant to this Agreement or any of the Loan Documents, Lender may approve or disapprove any act (or any action) or any document, delivery or other item, or where Lender's consent or approval is required in any respect or where any document or other item must be satisfactory to Lender, except in those specific instances where Lender has specifically agreed not to unreasonably withhold Lender's consent pursuant to the terms of this Agreement or any of the Loan Documents, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory or to grant or withhold consent shall be in the sole, absolute and unfettered discretion of Lender, without any express or implied obligation of reasonableness or good faith whatsoever and shall be final and conclusive.  Pledgor acknowledges and agrees that in no circumstance shall Pledgor have any claim or cause of action, in contract or in tort, against Lender as a result of the granting or withholding of any such consent or approval.  The inclusion of references to Lender's sole or absolute discretion in any particular provisions of this Agreement or any of the Loan Documents shall not limit or affect the applicability of this Section to all provisions of this Agreement or any of the Loan Documents, including those provisions wherein a specific reference to Lender's sole and absolute discretion is not made.  Without limiting the preceding provisions of this Section, in the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or in bad faith or unreasonably delayed acting in any case where, by Applicable Law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or in good faith or promptly, Pledgor agrees that neither Lender, Servicer nor their agents or employees shall be liable for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence and strict liability) or any other legal or equitable principles, and Pledgor's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably or in good faith shall be determined by an action seeking declaratory judgment.

Section 10.4    <u>Principles of Construction</u>.  The following principles of construction shall apply to this Agreement:

(i)    The titles and headings of the Sections and subsections of this Agreement have been inserted for convenience of reference only and are not intended to summarize or otherwise describe the subject matter of such Sections and subsections and shall not be given any consideration in the construction of this Agreement.

(ii)    All references to Sections and Exhibits are to Sections and Exhibits in or to this Agreement unless otherwise specified.  Any reference to "***this Section***" in this Agreement shall mean the Section in which such reference appears, and shall also be deemed refer to the subsections contained in such Section.

(iii)    Unless otherwise specified, the words "***hereof***", "***herein***" and "***hereunder***" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(iv)    The words "***includes***", "***including***" and similar terms shall be construed as if followed by the words "***without limitation.***"

(v)    Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

(vi)    Definitions contained in this Agreement or any other Loan Document which identify documents, including this Agreement or any other Loan Document, shall be deemed to include all Amendments thereto.

(vii)    Any reference in the Loan Documents to the successors or assigns of any Loan Party shall not be construed to imply any consent or approval by Lender of any such succession or assignment.

(viii)    Pledgor acknowledges and agrees that this Agreement and the other Loan Documents shall not be construed more strictly against Lender because Lender or its legal counsel was the primary draftsperson of this Agreement or such other Loan Document, as the case may be.

Section 10.5    <u>Successors and Assigns</u>.  This Agreement shall (a) create a continuing security interest in the Pledged Collateral; (b) remain in full force and effect for so long as any of the Obligations are outstanding; (c) be binding upon Pledgor and Pledgor's successors and assigns, and (d) inure to the benefit of Lender and its successors and permitted assigns.  Without limiting the foregoing, Lender may assign or otherwise transfer the loan evidenced by the Note or any portion thereof held by it to any other Person in accordance with the terms of the Note, and such other Person shall thereupon become vested with all the benefits in respect thereof granted herein or otherwise.  Pledgor may not assign its rights or delegate its obligations under this Agreement without the prior written consent of Lender.

Section 10.6    <u>Legal Tender of United States</u>.  All payments hereunder shall be made in coin or currency which at the time of payment is legal tender in the United States of America for public and private debts.

Section 10.7    <u>Time of Essence</u>.  Time is of the essence under this Agreement.

Section 10.8    <u>Notices</u>.  Any notice, request, demand, statement, authorization, approval, consent

or acceptance made hereunder shall be in writing and shall be (a) hand delivered or (b) sent by overnight delivery via United Parcel Service or other reputable overnight courier service, or (c)        sent        by registered or certified mail, postage prepaid with return receipt requested, or (d) sent by facsimile (with a confirmatory duplicate copy sent by United Parcel Service or any other reputable overnight courier service for overnight delivery) and shall be deemed given (i) upon delivery, if delivered in person, (ii) one (1) Business Day after being deposited with United Parcel Service or any other reputable overnight courier service for overnight delivery, or (iii) three (3) Business Days after being postmarked if sent by registered or certified mail, return receipt requested, or (iv) upon receipt if sent by facsimile, in each case addressed as follows:

|  |  |
|---|---|
| To Lender: | Archway Real Estate Income Fund I SPE I, LLC |
|  | 1875 Century Park East. Suite #900 |
|  | Los Angeles, CA 90067 |
|  | Attention: Joshua Kohan |
|  | Phone: (310) 893-5277 |
|  | Email: joshua@archwayfund.com |
|  |  |
| with a copy to: | Thompson Coburn LLP |
|  | 10100 Santa Monica Blvd., Suite 500 |
|  | Los Angeles, CA 90067 |
|  | Attention: Joshua Mogin |
|  | Phone: (310) 282-2520 |
|  | Email: jmogin@thompsoncoburn.com |
|  |  |
| To Pledgor: | David Halevy |
|  | 257 S. Linden Drive |
|  | Beverly Hills CA 90212 |
|  | Phone: (310) 666-2885 |
|  | Email: danhalevy@gmail.com |
|  |  |
| with a copy to | Locke Lord LLP |
|  | 300 S. Grand Ave., Suite 2600 |
|  | Los Angeles, CA 90071 |
|  | Attention: David S. Kupetz |
|  | Phone: (213) 687-6774 |
|  | Email: David.Kupetz@lockelord.com |

Any Person identified above may designate a change of address or facsimile number by notice to the other party sent pursuant to this Section, given at least 10 Business Days before such change of address is to become effective.

    Section 10.9    Entire Agreement.  This Agreement, together with the other Loan Documents, constitutes the entire agreement of Pledgor for the benefit of Lender with respect to the subject matter hereof and supersedes any prior agreements with respect to the subject matter hereof.

    Section 10.10    No Amendment or Waiver Without Writing.  No amendment or waiver of any provision of this Agreement nor consent to any departure by Pledgor herefrom nor release of all or any part of the Pledged Collateral shall in any event be effective unless the same shall be in writing and signed by

Lender and Pledgor. Any such waiver or consent or release shall be effective only in the specific instance and for the specific purpose for which it is given or to such greater extent as may be specified in such written instrument.

Section 10.11    <u>Severability</u>. Each provision of this Agreement shall be interpreted so as to be effective and valid under Applicable Law, but if any provision of this Agreement shall in any respect be ineffective, unenforceable or invalid under such law, such ineffectiveness, unenforceability or invalidity shall not affect the remainder of such provision or the remaining provisions of this Agreement.

Section 10.12    <u>Cumulative</u>. The obligations of Pledgor hereunder are joint and several and are in addition to any other obligations Pledgor may now or hereafter have to Lender.

Section 10.13    <u>Counterparts</u>. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single document. It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart.

Section 10.14    <u>No Revocation</u>. This Agreement may not be revoked by Pledgor and shall continue to be effective after any attempted revocation by Pledgor. The liquidation, dissolution or withdrawal of Borrower or Pledgor shall not terminate or affect this Agreement.

Section 10.15    <u>Subrogation</u>. Pledgor shall not exercise any right of subrogation with respect to Borrower or any Obligor with respect to payments made to Lender hereunder or otherwise until such time as all Obligations shall have been irrevocably paid and performed in full. In the case of the liquidation, winding-up or bankruptcy of Borrower or any Obligor (whether voluntary or involuntary) or in the event that Borrower or any Obligor shall make an arrangement or composition with its creditors, Lender shall have the right to rank first for its full claim and to receive all payments in respect thereof until its claim has been paid in full. To the extent permitted by law, Pledgor irrevocably releases and waives any subrogation rights or right of contribution or indemnity (whether arising by operation of law, contract or otherwise) which Pledgor may have against the Project, any collateral pledged as security for the Loan, Borrower or any Obligor or any Person constituting such Borrower or any Obligor if and to the extent any such right or rights would give rise to a claim under any Bankruptcy Law that payments to Lender with respect to the Obligations constitute a preference in favor of Pledgor or a claim under the Bankruptcy Code that any such preference is recoverable from Lender. If Pledgor becomes subrogated by payment or otherwise to any of the rights of Lender pursuant to any of the Loan Documents or applicable law, the rights of Lender to which Pledgor shall be subrogated shall be accepted by Pledgor "**as is**" and without any representation or warranty of any kind by Lender, express or implied, with respect to the legality, value, validity or enforceability of any of such rights, or the existence, availability, value, merchantability or fitness for any particular purpose of any collateral and shall be without recourse to Lender. Unless and until all of the Debt is irrevocably paid in full, Pledgor further unconditionally and irrevocably waives any right to enforce any remedy which Lender now has or may hereafter have against Borrower or any Obligor, and further waives any benefit of, and any right to participate in, any security now or hereafter held by Lender and waives any defense based upon an election of remedies by Lender which destroys or otherwise impairs any subrogation rights of Pledgor or the right of Pledgor to proceed against Borrower or any Obligor for reimbursement, or both.

Section 10.16    <u>Bankruptcy; Foreclosure</u>. Pledgor acknowledges that a principal purpose of this Agreement is to provide additional collateral to secure Borrower's payment and performance of the

Obligations to Lender in the event of the bankruptcy or insolvency of Borrower or any other Obligor, the commencement of proceedings by or against Borrower or any other Obligor under the Bankruptcy Code, or the appointment of a trustee or receiver for the estate or assets, or any part thereof, of Borrower or any other Obligor, and that Lender is entering into the Loan Documents in reliance upon the enforceability of this Agreement in the event of the bankruptcy or insolvency of Borrower or any other Obligor, the appointment of a trustee or receiver for the assets, or any part thereof, of Borrower or any other Obligor, or the commencement of proceedings by or against Borrower or any other Obligor under the Bankruptcy Code. Pledgor's obligations under this Agreement shall continue notwithstanding any extension, reduction, modification, composition or other alteration of the Obligations as a result of any proceeding under the Bankruptcy Code (as the Obligations existed without giving effect to any such extension, reduction, modification, composition or other alteration). Accordingly, Pledgor further acknowledges and agrees that in the event that proceedings by Lender against Borrower or any other Obligor are stayed by or in any court for any reason, or in the event that the Loan Documents are terminated or not enforced by action of a court or trustee in such proceedings, such stay, termination or unenforceability shall not prevent or prohibit any action by Lender upon this Agreement, notwithstanding any potential allegation by Pledgor that enforcement of this Agreement may in any manner inhibit or prevent the reorganization or rehabilitation of Borrower or any other Obligor. Pledgor acknowledges and agrees that Pledgor's efforts are not necessary for a successful reorganization or rehabilitation of Borrower or any other Person (including any other Obligor) and Pledgor therefore waives any right to seek a stay or injunction of any proceeding against Pledgor with respect to this Agreement whether based on Section 105 of the Bankruptcy Code or otherwise.

Section 10.17   Subordination.  As long as the Obligations remain outstanding, any indebtedness of Borrower or any Obligor to Pledgor now or hereafter existing is hereby subordinated to the Obligations. Pledgor agrees that Pledgor will not seek, accept, or retain for Pledgor's own account, any payment from or on behalf of Borrower or any Obligor on account of such subordinated debt.  Pledgor hereby unconditionally and irrevocably agrees that (i) Pledgor will not at any time assert against Borrower or any Obligor (or the estate of Borrower or any Obligor in the event Borrower or any Obligor becomes bankrupt or becomes the subject of any case or proceeding under the Bankruptcy Code) any right or claim to indemnification, reimbursement, contribution or payment for or with respect to any amounts Pledgor may pay or be obligated to pay Lender pursuant to this Agreement, and any and all obligations which Pledgor may perform, satisfy or discharge, under or with respect to this Agreement, unless and until all of the Obligations shall have been irrevocably paid in full, and (ii) Pledgor subordinates all such rights and claims (including "**claims**" as defined in 11 U.S.C. §§ 101 et seq.) to indemnification, reimbursement, contribution, exoneration or payment which Pledgor may have now or at any time against Borrower or any Obligor (or estate of Borrower or any Obligor in the event Borrower or any Obligor becomes bankrupt or becomes the subject of any case or proceeding under the Bankruptcy Code), whether such rights arise under an express or implied contract or by operation of law, to each of the obligations of Borrower under the other Loan Documents unless and until all of the Obligations shall have been irrevocably paid in full.  Pledgor further agrees not to assign, sell, pledge, hypothecate or otherwise transfer all or any part of the indebtedness of Borrower or any Obligor owing to Pledgor.

Section 10.18   Facsimile and Photocopy.  Lender and Pledgor hereby agree that any PDF, facsimile or photocopy signature on any Loan Document or on any notice, document or other certificate delivered pursuant to the Loan Documents shall be deemed to have the same force and effect as an original signature, and to the fullest extent permitted by Applicable Law may be used in lieu of an original signature to evidence the execution and delivery of the document, certificate or instrument to which such facsimile or photocopy signature is attached.

Section 10.19   Governing Law.  This Agreement shall be interpreted, construed and enforced according to the substantive laws of the State of **Texas** without giving effect to its principles of choice of law or conflicts of law.

Page 26

**Section 10.20**    **SUBMISSION TO JURISDICTION; JUDICIAL REFERENCE**.

**(a)    PLEDGOR, TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (A) SUBMITS TO PERSONAL JURISDICTION IN THE STATE OF CALIFORNIA OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS AGREEMENT, (B) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE LOS ANGELES COUNTY, STATE OF CALIFORNIA, (C) SUBMITS TO THE JURISDICTION OF SUCH COURTS AND, (D) TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, AGREES THAT PLEDGOR WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM.  BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO PLEDGOR AT THE ADDRESS FOR NOTICES DESCRIBED ABOVE, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).**

**(b)**    Pledgor hereby agrees that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Agreement and ANY MATTER RELATED THERETO, shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of  injunctive relief, appointment of a receiver, and/or claim and delivery.  The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*
*(Signature Page Follows)*

**IN WITNESS WHEREOF**, Pledgor and Lender have executed and delivered this Agreement as of the date first above written.

PLEDGOR:

_____

**DAVID HALEVY,** an individual

_____

**SUE HALEVY,** an individual

_____

**ALAN GOMPERTS,** an individual

_____

**SHARON GOMPERTS,** an individual

_____

**DANIEL HALEVY,** an individual

_____

**SIMON HARKHAM,** an individual

ACCEPTED AND AGREED TO:

LENDER:

ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,
a Delaware limited liability company

By: _____
    Name: Bobby Khorshidi
    Title: Authorized Signer

**IN WITNESS WHEREOF**, Pledgor and Lender have executed and delivered this Agreement as of the date first above written.

**PLEDGOR:**

_____
**DAVID HALEVY,** an individual

_____
**SUE HALEVY,** an individual

_____
**ALAN GOMPERTS,** an individual

_____
**SHARON GOMPERTS,** an individual

_____
**DANIEL HALEVY,** an individual

_____
**SIMON HARKHAM,** an individual

**ACCEPTED AND AGREED TO:**

**LENDER**:

ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,
a Delaware limited liability company

By: _____
      Name:
      Title:

## EXHIBIT A

## CONSENT OF BORROWER

This CONSENT OF BORROWER ("***Consent***"), dated as of **April 14, 2023,** by and between **SLA INVESTMENTS, LLC,** a California limited liability company ("***Borrower***"), to and for the benefit of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company** (together with its successors and assigns, collectively, "***Lender***").

Reference is made to that certain Pledge and Security Agreement (Interests in Borrower) (together with any amendments, the "***Pledge Agreement***") dated of even date herewith by and between **David Halevy**, an individual, ("***Pledgor***"), in favor of Lender.  For the purposes of this Consent, all capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement or in the Note referred to therein.

Borrower hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement and the other Loan Documents, (b) consents to the Pledge Agreement and the other Loan Documents, (c) agrees to comply with the terms and provisions thereof to which Borrower is bound, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement or the other Loan Documents, and (e) agrees to register on its books and records Lender's security interest in the Pledged Collateral.

Without limiting the foregoing, from and after the date hereof, Borrower agrees:

(a)      to deliver directly to Lender any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, Pledgor by virtue of its ownership of the Pledged Collateral issued by Borrower or upon exercise by Pledgor of any option, warrant or right attached to such Pledged Collateral.

(b)      not to cause, permit or suffer to occur any distribution in violation of the provisions of the Loan Documents;

(c)      to honor and comply with, and recognize Lender's rights as set forth in, <u>Section 8.1(i)</u> of the Pledge Agreement following receipt by Borrower of the Borrower Direction;

(d)      to honor and comply with, and recognize Lender's rights as set forth in, <u>Section 8.1(ii)</u> of the Pledge Agreement following receipt by Borrower of the Exercise Notice; and

(e)      to recognize Lender's or any other Successful Bidder's right to become the sole member of Borrower (i.e., owner of 100% of the membership interests in Borrower) following a sale of the Pledged Collateral in accordance with <u>Section 8.1(iii)</u> of the Pledge Agreement.

(f)      in the event of a sale of the Pledged Collateral in accordance with <u>Section 8.1(iii)</u> of the Pledge Agreement Borrower will, upon Lender's request and at Pledgor's expense:

(i)      provide Lender with such other information in Borrower's possession and financial projections as may be necessary or, in Lender's reasonable opinion, advisable to enable Lender to effect the sale of the Pledged Collateral; and

(ii)      do or cause to be done all such other acts and things as may be necessary to make the sale of the Pledged Collateral or any part thereof valid and binding and in compliance with

Applicable Law.

(g)    that the only original, executed, membership interest certificates (the "**Original Certificates**") representing the interests in the Borrower held by Pledgor, including, without limitation, any Original Certificates issued pursuant to Section 4.14 of the Pledge Agreement, shall be the issued Original Certificates delivered by Borrower and Pledgor to Lender on or before the closing of the Loan.

Borrower further acknowledges and agrees that it shall do all of the foregoing without any further notice from or consent or agreement of Pledgor.

For purposes of giving and receiving notices, <u>Section 10.8</u> of the Pledge Agreement is incorporated herein by reference.

*[REMAINDER OF PAGE INTENTOINALLY LEFT BLANK]*
*(Signature Page Follows)*

**IN WITNESS WHEREOF**, Borrower has executed this Consent as of the date first set forth above.

**BORROWER:**

**SLA INVESTMENTS, LLC,**
a California limited liability company

By: _____
    Name: Alan Gomperts
    Title: Manager

# EXHIBIT 4

## SETTLEMENT AND LOAN MODIFICATION AGREEMENT

This SETTLEMENT AND LOAN MODIFICATION AGREEMENT ("Agreement"), is dated as of April 19, 2023, by and among BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower"), ALAN GOMPERTS ("Alan"), an individual, DANIEL HALEVY ("Daniel"), an individual, and DAVID HALEVY ("David"), an individual together with Alan and Daniel, collectively and individually hereinafter referred to as "Guarantor"), on the one hand, and ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), on the other hand, with respect to the following facts, matters and issues.  Borrower and Guarantor together when referred to with Lender shall be collectively hereinafter referred to as the "Parties."

## RECITALS

A.    Lender has heretofore made a loan (the "Broadway Loan") to Borrower in the original maximum principal sum of Sixteen Million Nine Hundred Forty-Two Thousand Five Hundred and No/100 Dollars ($16,942,500.00) evidenced by, among other things, (i) that certain Promissory Note dated July 21, 2021 (together with any and all amendments thereto or modifications thereof, the "Note"), in the original principal face amount of $16,942,500.00, executed by Borrower to and in favor of Lender, and (ii) that certain Loan Agreement dated July 21, 2021, by and between Borrower and Lender (together with any and all amendments thereto or modifications thereof, the "Loan Agreement").

B.    As security for, among other things, the indebtedness and obligations under the Broadway Loan, Borrower, as trustor, executed and delivered to and in favor of Lender, as beneficiary, that certain  Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated July 23, 2021, and recorded on July 26, 2021, as Instrument No. 20211142009 in the Official Records of Los Angeles County, California (together with any and all amendments thereto or modifications thereof, the "Deed of Trust"), encumbering, without limitation, certain real property more particularly described in **Exhibit "A"** attached hereto and incorporated herein by this reference (as more particularly described therein, the "Property").

C.    Payment and performance of Borrower's indebtedness and obligations in connection with the Broadway Loan was and is guaranteed by Guarantor pursuant to a Continuing Guaranty executed by Guarantor and dated as of July 21, 2021 (the "Continuing Guaranty").

D.    Pursuant to the Deed of Trust, Borrower granted to and in favor of Lender a first priority security interest in and lien upon certain real and personal property described in the Deed of Trust (the "Deed of Trust Collateral"), to secure, without limitation, payment and performance of the indebtedness and obligations under and in connection with the Broadway Loan and the Note.  The Deed of Trust Collateral and any other collateral securing the indebtedness and obligations under the Broadway Loan shall be collectively referred to as the "Collateral." Lender's security interest in the Collateral was and is perfected under applicable law.

E.    This Agreement, the Note, Loan Agreement, Deed of Trust, Continuing Guaranty, and all other agreements, instruments and other documents executed by Borrower or Guarantor

in connection with the Broadway Loan shall at times hereinafter be referred to collectively as the "Broadway Loan Documents." Any and all terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement.

F.      Lender alleges that Borrower and Guarantor defaulted under the terms of the Broadway Loan Documents by, among other things, failing to obtain a certificate of occupancy for the Property by January 21, 2022 and failing to pay the Loan off in full as of August 1, 2022, the maturity date (collectively hereinafter the "defaults").

G.      On September 28, 2022, Lender filed its Verified Complaint for Breach of Guaranty against Guarantor in the Los Angeles County Superior Court entitled *Archway Real Estate Income Fund I SPE I, LLC, Plaintiff v. Alan Gomperts, et al., Defendants* Case Number 22STCV31742 (the "Litigation").

H.      On August 30, 2022, Lender caused to be commenced non-judicial foreclosure proceedings through the filing of a notice of default ("NOD") as instrument no. 20220859022 in the Official Records of Los Angeles County, California. The NOD is still pending.

I.      The Parties now desire to modify the Broadway Loan Documents, resolve and settle the Litigation, and rescind the NOD, subject to the terms and conditions set forth herein.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.      Recitals.  The recitals are incorporated herein by this reference as are all exhibits attached hereto.  Borrower and Guarantor, and each of them, represent and warrant to Lender that the factual information recited above is true and correct.  Except as specified herein, all of the terms and conditions of the Broadway Loan Documents, and each of them, shall remain in full force and effect.  In the event of any conflict or inconsistency between the terms, conditions, and provisions of this Agreement and the Broadway Loan Documents, the terms, conditions, and provisions of this Agreement shall prevail.

2.      Reaffirmation.  This Agreement is, in part, a reaffirmation of the obligations and indebtedness of Borrower and Guarantor to Lender as evidenced by the Broadway Loan Documents.  Therefore, Borrower and Guarantor each represent, warrant, covenant, and agree, that except as specified herein, all of the terms and conditions of the Broadway Loan Documents are in full force and effect, without waiver or modification of any kind whatsoever, and are ratified and confirmed in all respects.

3.      Acknowledgments.

A.      Borrower and Guarantor, and each of them, acknowledge the validity, priority and extent of the Broadway Loan Documents and acknowledge that the following sums are owed to the Lender as of April 19, 2023:

| | | |
|---|---|---|
| (1) Principal balance in the amount of | $16,942,500.00 | |
| (2) Non-default interest in the amount of | $1,171,385.63 | |
| (3) Default interest ("Default Interest") in the amount of | $1,656,129.46 | |
| (4) Late charges ("Late Charges") in the amount of | $0.00 | |
| (5) Legal and Trustee fees and costs ("Legal/Trustee Fees') in the amount of | $65,000.00 | (FRBC) |
| | $30,000.00 | (TC) |
| | $16,489.00 | (Trustee) |
| (6) GRAND TOTAL ("Amounts Owed") | $19,881,504.09 | |

In addition, interest continues to accrue at the rate of $8,471.25 per day, inclusive of default interest (the "Per Diem").

B.    Borrower and Guarantor, and each of them, acknowledge and confirm that neither Borrower nor Guarantor has any valid offset or defense to the Amounts Owed, obligations, and liability under the Broadway Loan Documents.

4.    New Loans.

A.    Concurrently with the execution of this Agreement, Lender shall make three (3) new loans in the aggregate amount of $4,000,000.00 (collectively, "New Loans"), as follows:

(1)    A loan to _Negev Investments, LLC ("Negev") in the principal amount of One Million Three Hundred Thousand and No/100 Dollars ($1,300,000.00) ("Negev Loan"), secured by the real property commonly known as 12800 Foxdale Drive, Desert Hot Springs, California ("Foxdale Property") and guaranteed by David. The guaranty shall be secured by his membership interest in Negev. The documents and instruments evidencing the Negev Loan are identified in Exhibit "B-1" attached hereto;

(2)    A loan to SLA Investments, LLC ("SLA") in the principal amount of One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) ("SLA Loan"), secured by the real property commonly known as 1040 S. Los Angeles Street, Los Angeles, California ("Los Angeles Property") and guaranteed by David, Sue Halevy ("Sue"), Alan, Sharon Gomperts a/k/a Sharon Halevy ("Sharon") and Daniel. The guaranty shall be secured by David, Sue, Alan, Sharon and Daniel's membership interest in SLA. The documents and instruments evidencing the SLA Loan are identified in Exhibit "B-2" attached hereto; and

(3)    A loan to David, David Halevy and Sue Halevy, as trustees of the Halevy Family Trust dated September 6, 2010 ("D&S Trust"), Alan, Alan Gomperts and Sharon Gomperts, as trustees of the Gomperts and Halevy Family Trust ("G&H Trust") and Daniel in the principal amount of Two Million Five Hundred Seventy-Five Thousand and No/100 Dollars

($2,575,000.00) ("Guarantor Loan"), secured by the real property commonly known as 3538 Greenfield Avenue, Los Angeles, California, owned by G&H Trust, 133 S. Palm Drive, Beverly Hills, California, owned by D&S Trust, and 8561 Horner Street, Los Angeles, California, owned by Daniel. The documents and instruments evidencing the Guarantor Loan are identified in Exhibit "B-3" attached hereto.

B.    The proceeds of the New Loans ("New Loans Proceeds") shall be disbursed and allocated as provided in the Negev Loan, SLA Loan and Guarantor Loan, as more particularly described in Exhibit "C" attached hereto, and shall be used for the creation of an interest reserve for the New Loan, payment of past due amounts owed by Broadway to Lender under the Broadway Loan Documents, creation of an interest reserve for the Broadway Loan and to pay certain fees and costs. To the extent that the New Loans Proceeds are insufficient to make all payments or deposits required pursuant to this Agreement, the Negev Loan, SLA Loan and Guarantor Loan, or any of them, Guarantor shall be required to do so, from their own funds, concurrently with the Settlement Closing (as herein defined).

5.    Amendments to Broadway Loan.

Upon Settlement Closing:

A.    The Maturity Date under the Broadway Loan shall be extended to December 1, 2023, at which time the entire principal balance under the Broadway Loan plus all accrued and unpaid interest thereon shall be due and payable as provided under the Broadway Loan Documents. From and after the Settlement Closing, any and all references in the Note, Loan Agreement, and the other Broadway Loan Documents to a maturity date of "August 1, 2022" shall be replaced with "December 1, 2023."

B.    The obligations of Borrower to obtain the Certificate of Occupancy on the Property no later than January 21, 2022 pursuant to Section 5.1(a) of the Loan Agreement is hereby amended to be required as soon as is reasonably practicable in the best efforts of Borrower, but in any event no later than the Maturity Date.

6.    Interest Reserve Deposit. Concurrently with the Settlement Closing, Guarantor shall deposit the sum of $892,874.03 (the "Interest Reserve Shortfall") into the Interest Reserve. The Interest Reserve Shortfall shall not bear interest. Borrower continues to authorize Lender, on a monthly basis, to disburse from the Interest Reserve the amount of interest accrued and unpaid to Lender under the terms of Section 12(b) of the Loan Agreement without further authorization on the part of Borrower. Such disbursements by Lender may be made by such means (including, as shall be satisfactory to Lender, in its sole and absolute discretion. Notwithstanding the Interest Reserve, Borrower remains liable and obligated to pay all accrued and unpaid interest when it is due and payable, in the event that the amounts in the Interest Reserve are insufficient to do so.

7.    Conditions Precedent to Settlement Closing. The obligations of Lender hereunder are expressly conditioned upon the following having occurred, or Lender having received on or prior to April 19, 2023 ("Settlement Closing"), all of the following amounts, documents, and

instruments in form and content satisfactory to Lender, in its sole and absolute discretion, opinion, and judgment:

        A.     This Agreement, fully executed by Borrower and Guarantor;

        B.     The closing of the Negev Loan;

        C.     The closing of the SLA Loan;

        D.     The closing of the Guarantor Loan;

        E.     Payment of the Legal/Trustee Fees;

        F.     Payment and/or deposit of any additional monies required pursuant to Section 6, above;

        G.     At Borrower's expense, endorsements to Lender's existing policy of title insurance insuring the continuing priority of the lien of the Deed of Trust in a first priority position; and

        H.     A Memorandum of Modification to the Deed of Trust, fully executed by Borrower and notarized for recording purposes.

        8.    <u>Rescission of NOD; Dismissal of Action</u>.  Upon the Settlement Closing:

        A.     Lender will cause the NOD to be rescinded, subject to the right of Lender to cause to a new notice of default to be recorded in the event there is any default under this Agreement or any of the other Broadway Loan Documents subsequent to the Settlement Closing. Further, as long as there is no default under this Agreement or any of the other Broadway Loan Documents from and after the date of this Agreement, interest on the Broadway Loan shall accrue and be payable at the non-default rate of interest provided for in the Note.  Furthermore, upon the Settlement Closing, Lender shall waive its right to collect the Default Interest and Late Charges.

        B.     Lender will cause to be filed with the Court a dismissal without prejudice of the Litigation, subject to the right of Lender to commence a new action or proceeding against Guarantor and any other parties, as determined by Lender, if there is a default under this Agreement or any of the other Broadway Loan Documents by which Guarantor is bound.

        9.    <u>Representations and Warranties of Borrower and Guarantor</u>.  Borrower and Guarantor hereby represent and warrant to Lender and covenant and agree with Lender as follows:

        A.     Borrower and Guarantor, and each of them, have full legal right, power and authority to enter into and perform this Agreement.  The execution and delivery of this Agreement by Borrower and Guarantor and the consummation by Borrower and Guarantor of the transactions contemplated hereby have been duly authorized by all necessary action by or on behalf of Borrower and Guarantor.  This Agreement is a valid and binding obligation of

Borrower and Guarantor, enforceable against Borrower and Guarantor in accordance with its terms.

B.  Neither the execution and delivery of this Agreement by Borrower and Guarantor, or either of them, nor the consummation by Borrower and Guarantor of the transactions contemplated hereby, conflicts with or constitutes a violation or a default under any law applicable to Borrower and Guarantor, or either of them, or any contract, commitment, agreement, arrangement or restriction of any kind to which Borrower or Guarantor is a party, by which Borrower or Guarantor is bound or to which any of Borrower's or Guarantor's property or assets is subject.

C.  There are no actions, suits or proceedings pending, or to the knowledge of Borrower or Guarantor, threatened against or affecting Borrower or Guarantor, in relation to its obligations to Lender or involving the validity and enforceability of this Agreement, or any of the other Broadway Loan Documents, as applicable, at law or in equity, or before or by any Governmental Agency, or which could have a material adverse effect on the financial condition, operations, properties, assets, liabilities or earnings of Borrower or Guarantor, or the ability of Borrower or Guarantor to perform their obligations to Lender.

D.  Borrower and Guarantor, and each of them, hereby reaffirm and confirm that the representations and warranties of Borrower and Guarantor, and each of them, contained in the Broadway Loan Documents are true, correct and complete in all material respects as of the date of this Agreement.

10.  Revival of Obligation.

A.  Borrower and Guarantor acknowledge and agree that in the event that the payment of money, this Agreement, or the grant of collateral should for any reason subsequently be declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then as to that which is repaid or restored pursuant to any such Voidable Transfer (including all costs, expenses and attorneys' fees of Lender related thereto, including, without limitation, relief from stay or similar proceedings), the liability of Borrower and Guarantor to Lender shall automatically be revived, reinstated and restored as though such Voidable Transfer had never been made to Lender.

B.  Nothing set forth herein is an admission that such Voidable Transfer has occurred.  Borrower and Guarantor expressly acknowledge that Lender may rely upon advice of counsel, and if so advised by counsel, may, in the exercise of Lender's sole opinion and judgment, settle, without defending, any action to void any alleged Voidable Transfer, and that upon such settlement, Borrower and Guarantor shall again be liable for any deficiency resulting from such settlement as provided in this Agreement.

11.  Waiver of Certain Bankruptcy Rights.

Borrower and Guarantor acknowledge and agree that but for Lender entering into this Agreement with Borrower and Guarantor, Lender would have continued to diligently pursue all of its rights and remedies under the Broadway Loan Documents, at law and in equity, against Borrower and Guarantor.  As an additional inducement to and material consideration for Lender agreeing to the modifications and extension provided in this Agreement, Borrower and Guarantor agree that in the event a Bankruptcy or Judicial Action (as hereinafter defined in this Section 11) is commenced which subjects Lender to any stay in the exercise of Lender's rights and remedies under the Broadway Loan Documents with respect to the Collateral, including, but not limited to, the automatic stay imposed by Section 362 of the United States Bankruptcy Code (individually and collectively, "Stay"), then Borrower and Guarantor irrevocably consent and agree that such Stay shall automatically be lifted and released against Lender with respect to the Collateral, and Lender shall thereafter be entitled to exercise all of its rights and remedies under the Broadway Loan Documents with respect to the Collateral, subject, however, to the terms and conditions of this Agreement.  Borrower and Guarantor acknowledge that each is knowingly, voluntarily, and intentionally waiving each of such party's rights to any Stay and agrees that the benefits provided to Borrower and Guarantor under the terms of this Agreement are valuable consideration for such waiver.  As used in this Section 11, the term "Bankruptcy or Judicial Action" shall mean any voluntary or involuntary case filed by or against Borrower and Guarantor, or either of them, under the United States Bankruptcy Code, or any voluntary or involuntary petition in composition, readjustment, liquidation, or dissolution, or any state and federal bankruptcy law action filed by or against Borrower and Guarantor, or either of them, any action where Borrower and Guarantor, or either of them, are adjudicated as bankrupt or insolvent, any action for dissolution of Borrower and Guarantor, or either of them, or any action in furtherance of any of the foregoing, or any other action, case, or proceeding that has the effect of staying (or in which a stay is being obtained against) the enforcement by Lender of its rights and remedies with respect to the Collateral under the Broadway Loan Documents.

12.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of Borrower and Guarantor and their respective successors, assigns, directors, officers, shareholders, partners, accountants, heirs, executors, administrators, trustees and trustees in bankruptcy.

13.    <u>Release by Borrower and Guarantor</u>.

A.    Borrower and Guarantor, on behalf of themselves, their respective successors and assigns, and each of them, do hereby forever relieve, release, acquit and discharge Lender and its predecessors, successors and assigns, and their respective past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Borrower and Guarantor, or either of them, now own or hold or have at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing, in whole or in part, on or before the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or

in connection with the Recitals above, the Loan, the facts pertaining to this Agreement, any collateral heretofore granted to Lender or granted in connection herewith, or to any other obligations of Borrower and Guarantor, or either of them, to Lender, or the lending arrangements between Lender and Borrower and Guarantor, all individually and collectively.

        (1)    As to the matters released herein, Borrower and Guarantor expressly waive any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her, would have materially affected his or her settlement with the debtor or released party."

        (2)    Borrower and Guarantor expressly waive and release any right or benefit which they have or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, Borrower and Guarantor acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true. Nevertheless, it is the intention of Borrower and Guarantor, through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

        B.    Borrower and Guarantor are the sole and lawful owners of all right, title and interest in and to every claim and other matter which they purport to release herein, and they have not heretofore assigned or transferred, or purported to assign or transfer to any person or any entity claims or other matters herein released. Borrower and Guarantor shall indemnify, defend and hold Lender and each of the other Released Parties, and each of them, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

    14.    <u>No Joint Venture, Management or Control</u>. Notwithstanding any provision of this Agreement and/or of the Broadway Loan Documents:

        A.    Lender is not and shall not be construed to be a partner, joint venture, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower, Guarantor or any other Person;

B.    Lender shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of Borrower or Guarantor; and

C.    Borrower and Guarantor, or either of them, do not have any claims, causes of action or defenses to their obligations to Lender based on any allegations of management or control exercised by Lender. Borrower and Guarantor, and each of them acknowledge and agree that Lender does not manage or control them in any way.

15.    <u>No Further Commitments to Lend</u>.    Borrower and Guarantor agree and acknowledge that Lender will not and has no obligation to advance, provide or loan any further or additional monies or credit to Borrower and the obligation of Lender to advance any further sums to Borrower under the Broadway Loan Documents has been terminated thereunder. Borrower and Guarantor further agree and acknowledge that Lender will not and has no obligation to further extend the time for payment of any obligations owing to or arising in favor of Lender by Borrower and Guarantor, or either of them.

16.    <u>Miscellaneous.</u>

A.    Section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

B.    This Agreement may be executed in one or more counterparts but all of the counterparts shall constitute one agreement; provided, however, this Agreement shall not be effective and enforceable unless and until it is executed by all parties hereto.

C.    This Agreement and the other documents and instruments executed in connection therewith constitute the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.

D.    This Agreement is not a novation, nor, except as expressly provided in this Agreement, is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers or rights set forth in the Broadway Loan Documents. Nothing contained in this Agreement shall be deemed to constitute a waiver by Lender of any required performance by Borrower and Guarantor, or either of them, of any default heretofore or hereafter occurring under or in connection with the other Broadway Loan Documents. In the event there is a conflict in any term, condition or provision of this Agreement, on the one hand, and the Loan Agreement or any of the other Broadway Loan Documents, on the other hand, the terms, conditions and provisions of this Agreement are to control.

E.    Borrower and Guarantor hereby further represent and warrant as follows:

(1)    Borrower and Guarantor have received, or have had the opportunity to receive, independent legal advice from attorneys of each of their choice with respect to the advisability of executing this Agreement and prior to the execution of this Agreement by Borrower and Guarantor, their attorneys reviewed this Agreement and discussed this Agreement with them and have made all desired changes;

   (2) Except as expressly stated in this Agreement, neither Lender nor any other person or entity has made any statement or representation to Borrower or Guarantor regarding facts relied upon by Borrower or Guarantor;

   (3) Borrower and Guarantor do not rely upon any statement, representation or promise of Lender or any other person or entity in executing this Agreement except as expressly stated in this Agreement;

   (4) The terms of this Agreement are contractual and not a mere recital;

   (5) This Agreement has been carefully read by, the contents hereof are known and understood by, and it is signed freely by Borrower; and

   (6) This Agreement and the releases contained herein are intended to be final and binding against Borrower and Guarantor, and Borrower and Guarantor acknowledge that Lender is expressly relying on the finality of this Agreement as a substantial, material factor inducing Lender's execution of this Agreement.

   F. This Agreement and any and all documents executed in connection herewith are entered into and made to be performed in Los Angeles County, California, and in the event that litigation is instituted in connection with this Agreement, and any and all documents executed in connection herewith, it shall be instituted in the Courts for Los Angeles County, California.  This Agreement shall be construed under the laws of the State of California.

   G. Upon indefeasible payment and performance in full of the Broadway Loan Documents, Lender shall provide Borrower the <u>Limited Release</u> in the form of Exhibit "D" attached hereto.

   H. The waiver of any existing or future default by any party to this Agreement or of any of the terms of this Agreement shall not be deemed a waiver of any future default or term.  No waiver of any other provisions hereof shall be deemed or constitute a waiver of any other provision, and no waiver of any type shall be binding unless evidenced by a writing signed by the party making waiver.

  17. <u>JUDICIAL REFERENCE</u> – The parties hereby agree that any claims, controversies, disputes, or questions of interpretation, whether legal or equitable, arising out of, concerning or related to this Agreement and ANY MATTER RELATED THERETO, shall be heard by a single referee by consensual general judicial reference pursuant to the provisions of California Code of Civil Procedure sects 638 et seq., who shall determine all issues of fact or law and to report a statement of decision. The referee shall also have the power to hear and determine proceedings for ancillary relief, including, but not limited to, applications for attachment, issuance of injunctive relief, appointment of a receiver, and/or claim and delivery.  The costs of the proceeding shall be borne equally by the parties to the dispute, subject to the discretion of the referee to allocate such costs based on a determination as to the prevailing party(ies) in the proceeding.  Notwithstanding the foregoing, the judicial reference provided herein shall not apply to the New Loans. ***By initialing below the parties acknowledge that they have read and understand the foregoing Judicial Reference provisions and understand that they are waiving their right to a jury trial.***

The parties below have initialed this section to further indicate their awareness and acceptance of each and every provision hereof.

_____          _____          _____
Borrower's Initials                         Alan's Initials                                Daniel's Initials

_____          _____          _____
David's Initials                              Guarantor's Initials                        Lender's Initials

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first written above.

**BORROWER:**

BROADWAY AVENUE INVESTMENTS LLC.
a California limited liability company

By: _____
Name: Alan Gomperts
Its: Manager

**GUARANTOR:**

_____
ALAN GOMPERTS, an individual

_____
DANIEL HALEVY, an individual

_____
DAVID HALEVY, an individual, by Daniel Halevy as his attorney in fact

**LENDER:**

ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,
A Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signer

## EXHIBIT "A"
## LEGAL DESCRIPTION

THE LAND REFERRED TO IS SITUATED IN THE COUNTY OF LOS ANGELES, CITY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF BLOCK 25 OF THE HUBER TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 2, PAGE 280 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY LINE OF BROADWAY, 80 FEET WIDE, WITH THE DIVIDING LINE ESTABLISHED BY AGREEMENT AND DEED BETWEEN THE LOS ANGELES TRUST COMPANY AND NIAGARA BUILDING COMPANY, RECORDED DECEMBER 11, 1908 IN BOOK 3568, PAGE 93 OF DEEDS, RECORDS OF SAID COUNTY, SAID INTERSECTION BEING DISTANT NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 180.47 FEET, MORE OR LESS, FROM THE NORTHERLY LINE OF 8TH STREET, 60 FEET WIDE, AS SHOWN ON MAP OF A RESUBDIVISION OF A PORTION OF BLOCK 25, HUBER TRACT, RECORDED IN BOOK 5, PAGE 15 OF MAPS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE NORTH 37° 48' EAST ALONG SAID NORTHWESTERLY LINE, 60 FEET, MORE OR LESS, TO THE MOST EASTERLY CORNER OF LOT 4 IN SAID BLOCK 25 OF HUBER TRACT; THENCE NORTH 52° 12' WEST ALONG THE NORTHEASTERLY LINE OF SAID LOT 4, A DISTANCE OF 165 FEET, MORE OR LESS, TO THE MOST NORTHERLY CORNER OF SAID LOT 4; THENCE SOUTH 37° 48' WEST ALONG THE NORTHWESTERLY LINE OF SAID LOT 4 AND OF LOT 3 OF BLOCK 25 OF SAID HUBER TRACT, 60 FEET, MORE OR LESS, TO SAID DIVIDING LINE; THENCE SOUTH 52° 12' EAST, ALONG SAID DIVIDING LINE, 165 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5144-014-030

**EXHIBIT "B-1"**
**NEGEV LOAN**

1. Loan Agreement
2. Promissory Note
3. Assignment of Leases and Rents
4. Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Guaranty
6. Borrower's Closing Certificate
7. Borrower's Resolutions
8. Building Laws Indemnity Agreement
9. Hazardous Materials Indemnity Agreement
10. Undelivered Items Letter
11. Pledge and Security Agreement

**EXHIBIT "B-2"**
**SLA LOAN**

1. Promissory Note
2. Loan Agreement
3. Security Instrument -Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Assignment of Leases and Rents
5. Guaranty
6. Hazardous Materials Indemnity Agreement
7. Building Laws Indemnity Agreement
8. Borrowers Incumbency Certificate and Resolutions
9. Borrower's Closing Certificate
10. Undelivered Items letter
11. Pledge Agreement

## EXHIBIT "B-3"
## G&H LOAN

1. Promissory Note
2. Loan Agreement
3. Security Instrument (Greenfield) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Security Instrument (Horner Street) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
5. Security Instrument (Palm Drive) - Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing
6. Hazardous Materials Indemnity Agreement
7. Building Laws Indemnity Agreement
8. Borrower's Closing Certificate
9. Undelivered Items letter

# EXHIBIT "C"
## ALLOCATION OF NEW LOANS PROCEEDS

| SLA Loan | | Negev Loan | | Guarantor Loan | |
|---|---|---|---|---|---|
| Sources | | Sources | | Sources | |
| Loan | $   125,000.00 | Loan | $ 1,300,000.00 | Loan | $ 2,575,000.00 |
| Total Sources | $   125,000.00 | Total Sources | $ 1,300,000.00 | Total Sources | $ 2,575,000.00 |
| | | | | | |
| Uses | | Uses | | Uses | |
| Interest Reserve SLA Loan | $     6,927.08 | Interest Reserve Negev Loan | $     72,041.67 | Interest Reserve Guarantor Loan | $   142,697.92 |
| Per Diem SLA Loan (4/19-5/1) | $        395.83 | Per Diem Negev Loan (4/19-5/1) | $      4,116.67 | Per Diem Guarantor Loan (4/19-5/1) | $      8,154.17 |
| Back Pay Broadway (4/19) | $    36,605.80 | Back Pay Broadway (4/19) | $   380,700.33 | Back Pay Broadway (4/19) | $   754,079.50 |
| Per Diem Broadway Loan (4/19-5/1) | $     1,508.23 | Per Diem Broadway Loan (4/19-5/1) | $     15,685.62 | Per Diem Broadway Loan (4/19-5/1) | $    31,069.60 |
| 8-Month IR Broadway Loan | $    26,394.08 | 8-Month IR Broadway Loan | $   274,498.44 | 8-Month IR Broadway Loan | $   543,718.05 |
| Paydown Broadway Loan | $    53,168.97 | Paydown Broadway Loan | $   552,957.28 | Paydown Broadway Loan | $ 1,095,280.76 |
| | | | | | |
| Total Uses | $   125,000.00 | Total Uses | $ 1,300,000.00 | Total Uses | $ 2,575,000.00 |

**EXHIBIT "D"**
**LIMITED RELEASE**

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC, a Delaware limited liability company ("Lender"), hereby releases:

a.    BROADWAY AVENUE INVESTMENTS LLC, a California limited liability company ("Borrower") from all contractual liability and obligations under the Note and any of the other Loan Documents executed by Borrower in favor of Lender, except as otherwise provided in this Limited Release ("Release").

b.    ALAN GOMPERTS ("Alan"), DANIEL HALEVY ("Daniel") and DAVID HALEVY ("David," and together with Alan and Daniel, individually and collectively, "Guarantor") from all contractual liability and obligations under the Continuing Guaranty and any of the other Loan Documents executed by Guarantor in favor of Lender, except as otherwise provided in this Release.

1.    Notwithstanding the foregoing, the Release shall not apply to and hereby excludes Borrower's obligations and liability under (a) that certain Hazardous Materials Indemnity Agreement, dated July 21, 2021 by Borrower in favor of Lender, (b) Guarantor's obligations and liabilities under clause (g) of "Recourse Amounts" under Section 1 Definitions of the Continuing Guaranty, and (c) any other obligations, liability or indemnity contained in any Loan Document that survives repayment of the Note and any other obligations under the Loan Documents.

2.    Borrower and Guarantor acknowledge and agree that in the event that all or any part of any payment or credit that reduces or pays off the Note or any other obligation under the Loan Documents is declared by a court of competent jurisdiction  declared to be "fraudulent" or "voidable" within the meaning of any state, federal or foreign law relating to fraudulent conveyances, preferential or otherwise voidable or recoverable, in whole or in part, for any reason, under the United States Bankruptcy Code or any other federal, foreign or state law (collectively referred to herein as "Voidable Transfer"), and Lender is required to pay or restore any such Voidable Transfer, or any portion thereof, then this Release shall be null and void, and of no force and effect, unless and until the Note and any such obligations under the Loan Obligations are indefeasibly paid in full.

3.    Any capitalized term not expressly defined in this Release shall have the meaning ascribed to it in that certain Settlement and Loan Modification Agreement by and among Borrower, Guarantor and Lender, dated as of April __, 2023.

This Release is executed by the undersigned as of the ___ day of _____, 202_.

ARCHWAY REAL ESTATE INCOME FUND I
SPE I, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

# EXHIBIT B

## ASSIGNMENT OF LOAN DOCUMENTS

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("***Assignor***"), does hereby sell, transfer and assign to **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited partnership ("***Assignee***"), all of Assignor's right, title and interest in and to the documents, instruments and agreements listed on Exhibit A, attached hereto and incorporated herein by this reference, (collectively, the "***Loan Documents***").  It is the intention of Assignor to transfer and assign to Assignee all of the right, title and interest, benefits and obligations and duties held by Assignor in, to and under the Loan Documents and the loan evidenced thereby.

IN CONNECTION THEREWITH, Assignee hereby accepts the foregoing assignment and hereby assumes all of the duties, obligations and liabilities of Assignor under and with respect to the loan as evidenced by the Loan Documents.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Assignment of Loan Documents to be effective as of the date set forth below.

Date: As of September 30, 2024

**ASSIGNOR:**

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company

By: _____
Name: Bobby Khorshidi
Title: Authorized Signatory

**ASSIGNEE:**

**ARCHWAY BROADWAY LOAN SPE, LLC,**
a Delaware limited partnership

By: _____
Name: Bobby Khorshidi
Title:  Authorized Signatory

EXHIBIT A
LOAN DOCUMENTS

1) Assignment of Leases and Rents, dated as of April 14, 2023, made by **SLA INVESTMENTS, LLC**, a California limited liability company ("*SLA*"), as assignor, in favor of **ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,** a Delaware limited liability company ("*Lender*"), as assignee, and recorded April 21, 2023, as Document No. 20230258319 in the official records of Los Angeles County, California.

2) Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of April 14, 2023, made by SLA, as borrower, in favor of Lender, as beneficiary, and recorded April 21, 2023, as Document No. 20230258318 in the official records of Los Angeles County, California.

3) Borrower Closing Certificate, dated April 14, 2023, executed by SLA in favor of Lender.

4) Borrower Resolutions, dated April 14, 2023, executed by SLA.

5) Building Laws Indemnity Agreement, dated April 14, 2023, executed by SLA in favor of Lender.

6) Continuing Guaranty, dated April 14, 2023, executed by **ALAN GOMPERTS,** an individual**, DANIEL HALEVY,** an individual, **DAVID HALEVY,** an individual**, and SUE HALEVY,** an individual ("*Guarantor*"), in favor of Lender.

7) Hazardous Material Indemnity Agreement, dated April 14, 2023, executed by SLA in favor of Lender.

8) Loan Agreement, dated April 14, 2023, executed by SLA and Lender.

9) Promissory Note dated April 14, 2023, in the original amount of $125,000.00, made by SLA, and payable to the order of Lender.

10) UCC Financing Statement filed with the California Secretary of State's Office; and

11) All other instruments and agreements executed in connection with any of the foregoing in or under which Lender has any right, title or interest.

## ALLONGE

FOR VALUE RECEIVED, the undersigned, **ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC**, a Delaware limited liability company ("*Archway*"), the original payee under that certain Promissory Note, dated as of April 14, 2023, in the original principal amount of $125,000.00, made by **SLA INVESTMENTS, LLC**, a California limited liability company ("*Borrower*"), and payable to the order of Archway (the "*Note*"), to which this endorsement is affixed, absolutely assigns, transfers, endorses, negotiates, and sets over to and makes payable to the order of **ARCHWAY BROADWAY LOAN SPE, LLC**, a Delaware limited liability company ("("*Archway Broadway*"), its successors and assigns, the Note, without recourse, representation or warranty of any kind, except as and to the extent set forth in the Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Archway to Archway Broadway, dated on or about the hereof. This assignment includes the Note, all interest, principal, and other sums due or to become due under the Note, and all other rights of any nature accrued or to accrue under the Note.

Dated: September 18, 2024

**ARCHWAY REAL ESTATE INCOME FUND I REIT, LLC fka ARCHWAY REAL ESTATE INCOME FUND I SPE I, LLC,**
a Delaware limited liability company,

By: _____
Name: Bobby Khorshidi, a.k.a. Babak Khorshidi
Title: Authorized Officer and Agent